NOTICE

Decision filed 12/03/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 220275-U

NO. 5-22-0275

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Wabash County. |
| | ) | |
| v. | ) | No. 19-CF-29 |
| | ) | |
| GLEN E. HOWDER, | ) | Honorable |
| | ) | William C. Hudson, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE BARBERIS delivered the judgment of the court.
Justices Boie and Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm defendant's convictions and sentences where the State's evidence was sufficient evidence to prove defendant guilty of child pornography and aggravated criminal sexual abuse, the trial court's failure to hold a reliability hearing was invited error and did not constitute plain error or ineffective assistance of counsel, the admission of certain photograph exhibits and testimony did not constitute plain error or ineffective assistance of counsel, the court did not abuse its discretion by barring evidence on a collateral issue and defense counsel was not ineffective for introducing such evidence, defendant's sentence for child pornography was not excessive, and the court did not abuse its discretion by ordering defendant's sentences for aggravated criminal sexual abuse to run consecutively.

¶ 2    Following a jury trial in the circuit court of Wabash County, defendant, Glen E. Howder, was convicted of one count of soliciting child pornography (720 ILCS 5/11-20.1(a)(4) (West 2018)) and two counts of aggravated criminal sexual abuse (*id.* § 11-1.60(b)). The trial court sentenced defendant to 30 years in prison—20 years for soliciting child pornography and two 5-

1

year terms for aggravated criminal sexual abuse, to be served consecutively. Defendant appeals, arguing that (1) the State failed to prove him guilty, beyond a reasonable doubt, of soliciting child pornography and one count of aggravated criminal sexual abuse; (2) the court erred by admitting the minor victim's out-of-court statements without first conducting a pretrial reliability hearing as required by section 115-10(b) of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10(b) (West 2018)) or, alternatively, defense counsel was ineffective for failing to raise the issue; (3) the court erred by admitting other-crimes evidence at trial; (4) the court erred by barring defense counsel from presenting evidence impeaching the minor victim or, alternatively, counsel was ineffective for introducing other-crimes evidence after he was barred from perfecting the related impeachment; and (5) his 20-year sentence for child pornography was excessive and the court erred by ordering his sentences for aggravated criminal sexual abuse to run consecutively. For the following reasons, we affirm.

¶ 3                                I. Background

¶ 4      We limit our recitation to those facts relevant to our disposition of this appeal. We recite additional facts in the analysis section as necessary to address defendant's specific arguments.

¶ 5      From July 2015 to September 2017, defendant babysat his minor grandchildren, R.H. and A.H., while their parents, Matt and Jessica Howder, were at work. R.H. was between the ages of 9 and 11 during this time.

¶ 6      On February 21, 2019, the State charged defendant by information, in Wabash County (19-CF-29), with one count of soliciting child pornography (count I), a Class X felony (720 ILCS 5/11-20.1(c-5) (West 2018)), alleging that defendant solicited, used, persuaded, induced, enticed, or coerced R.H., a female child he knew to be under the age of 18, to appear in a photograph in which the child was depicted in a pose involving the lewd exhibition of unclothed genitals. The State

2

further alleged that R.H. was under the age of 13. The State also charged defendant with two counts of aggravated criminal sexual abuse (counts II and III), both Class 2 felonies (*id.* § 11-1.60(g)), alleging that defendant committed two separate acts of sexual conduct with R.H., a minor under the age of 18 who was defendant's family member, by fondling the minor's vagina through clothing (count II) and by touching defendant's penis to the minor's vagina through clothing (count III). The State also charged defendant with one count of unauthorized video recording (count IV) (*id.* § 26-4), a Class 3 felony, alleging that defendant knowingly made a video recording of A.H., a minor under the age of 18, without the minor's consent in the minor's residence. The State alleged that the conduct giving rise to the charges occurred between May 3, 2015, and September 8, 2017.

¶ 7    Defendant was also separately charged in Edwards County (19-CF-7) with five counts of possession of child pornography. The charges stemmed from his possession of certain electronic files on a cell phone on September 11, 2017.

¶ 8    It appears that, although Wabash and Edwards Counties were separate venues, the parties initially agreed to join the Wabash County case (19-CF-29) and the Edwards County case (19-CF-7) for pretrial purposes. The matters were initially heard by either the Wabash County or Edwards County circuit court.

¶ 9                          A. Pretrial Motions

¶ 10    On June 24, 2019, the State filed a motion to admit proof of other crimes, wrongs, or acts pursuant to section 115-7.3 of the Code (725 ILCS 5/115-7.3 (West 2018)). Specifically, the State sought to admit certain images and prior victim testimony. The State alleged that defendant was

3

charged with five counts of child pornography in the associated Edwards County case (19-CF-7).[1] The State alleged that certain images relevant to both cases were located on a Samsung Galaxy S4 Mini cell phone, which was seized from defendant's residence on September 11, 2017. The State alleged that forensic examiner Mark Sheftick identified 145 potential images of child pornography on the cell phone. The State further alleged that, in addition to the images discovered on defendant's cell phone, there was evidence that defendant previously committed sexual acts with two underage females during the 1990s. The State alleged that Megan Howder, defendant's daughter, made allegations of sexual abuse by defendant in 1997, that defendant was charged related to this pattern of conduct in early 1998, and that the charges were ultimately dropped after Megan recanted under pressure from "various parties." The State alleged that Kristi Emmons, the daughter of defendant's prior girlfriend, made allegations that defendant touched her breasts and vagina through clothing while alone with her, although defendant was never charged for this alleged conduct.

¶ 11    On November 13, 2019, defense counsel filed a motion to sever the offenses charged in Edwards County from those charged in Wabash County. Defendant alleged that the offenses arose from separate, unrelated transactions, and that he would be prejudiced if the offenses were tried together. The trial court ultimately granted defense counsel's motion and severed the cases for trial purposes.

¶ 12    On March 26, 2020, the State filed an amended motion to admit proof of other crimes, wrongs, or acts. The State's amended motion sought to admit the same evidence as the original

---

[1]While difficult to discern from the record, it appears that the five images which formed the bases for the charges in Edwards County included images of young, unclothed females and males. It appears that two of the images depicted young, unclothed males and three of the images depicted young, unclothed females.

motion but acknowledged that the Edwards County case had been severed from the Wabash County case.

¶ 13    On October 9, 2020, the trial court addressed the State's amended motion at a hearing. The court clarified that the State sought to introduce in the Wabash County case the five digital images charged in the Edwards County case, as well as 100 other files that met the definition of child pornography. The State clarified that it sought to admit testimony regarding the 100 image files recovered from defendant's phone, as well as any of those photographs the court would allow. Based on its interpretation of section 115-7.3(b) and *People v. Reber*, 2019 IL App (5th) 150439, the court noted that it was required to weigh the proximity in time to the present offense, the degree of factual similarity to the charged offense compared to the evidence sought to be introduced, and any other relevant facts and circumstances. The court noted that it was also required to determine if the images "were similar to the events that were charged or the acts that were charged as well as the images that were charged." Accordingly, the court noted that the five images from the Edwards County case, along with the other photographs, "need[ed] to be substantially similar *** to cover that prong."

¶ 14    The State argued that testimony regarding the total number of images found on defendant's phone negated any potential defenses that "a grandchild accidentally put something inappropriate on a phone, a mistaken picture that showed up." The State further asserted that the images made it "a lot harder to say this was an accident, that this was something that didn't just show, that it wasn't intentional, that there was no sexual interest in children."

¶ 15    Defense counsel argued that that the five images from the Edwards County case were dissimilar to the conduct charged in Wabash County. Defense counsel noted that there was no allegation that defendant produced, or solicited, the images from Edwards County and that the

images from Edwards County were "commercial" photographs. Defense counsel asserted that the State sought "to use what it even would concede would be your garden-variety website photographs to, in a sense, bolster the allegations that [defendant] ordered or told a child to take a picture of themselves with his phone. I think the Court can see what a big stretch that is."

¶ 16     The State acknowledged that "[t]he five [images] that [were] charged in Edwards [County], some of those counts do involve male children, not just female, as opposed to the Wabash case, which is just female." The trial court stated, "Well, I can tell you right now that I don't think it would be appropriate to admit the pictures of the male child pornography in the Wabash County case." The court noted that it would not be the same or similar "if there's no male child pornography charged in 19-CF-29 in Wabash County."

¶ 17     When the trial court asked the State which image or images "ma[d]e up the charges" in count I of the Wabash County case, the State responded, "That I don't have a printout of." The State described the photograph that formed the basis for count I in the Wabash County case as follows: "It is, essentially, Your Honor, it's a crouch down over a camera of an underage female's vaginal area, like with a handheld—like with the camera underneath between her legs."[2] When the court asked if "that's the child that's alleged to be under the age of 13," the State responded, "Yes, with the initials as charged in the Information." The court then asked if that was the only image that was part of the actual charged material in the information, and the State responded, "That is correct, Your Honor." The following colloquy then took place between the court and the State:

> "THE COURT: Okay. So I would entertain five pictures that are similar—the same or similar—to that offense that could be published to the jury.
> [THE STATE]: By same or similar, do you mean lewd exhibition of genitals? See that's where I'm getting a little bit—

---

[2]It does not appear from the record that the State sought to admit this photograph as other-crimes evidence.

THE COURT: Based on my review of the case law, you'd have to have—yeah. The same or similar to that image, if you want images published to the jury that are alleged to be in possession of the defendant.

[THE STATE]: Okay.

THE COURT: I think if you just throw a bunch—as [defense counsel] described—a bunch of pictures that are considered child pornography, I don't know how—how I can rule that they satisfy the first prong of being same or similar."

¶ 18    Following a brief recess, the State presented 10 additional images of underage females recovered from defendant's cell phone to the trial court for review. The following colloquy then took place between the State and the court:

"THE COURT: Okay. So that the record is clear then, you have given me a laptop here. It has several images on it. And you've listed ten images numerically and then—with the title of the file—and these are the ten that the State is seeking to have introduced in the Wabash County trial, correct?

[THE STATE]: Yes, Your Honor. And these are images of underage females, specifically the first eight that are selected. And then the last two images involve images of underage females with an older male engaged in a sexual act, which also relates directly to the charges in Wabash County.

THE COURT: All right. And so, the State is alleging that these images then satisfy 115-7.3(b)—I'm sorry—(c)(2) that they bear a sufficient degree of factual similarity to the charged offenses in that case.

[THE STATE]: Yes, Your Honor."

¶ 19    Defense counsel responded that defendant had no part in producing, or soliciting, the photographs the State sought to introduce. Defense counsel clarified that defendant was charged with soliciting child pornography, not possessing child pornography, in Wabash County. Defense counsel asserted that the admission of such photographs "would be extremely prejudicial" and "confusing to the jury." Accordingly, defense counsel objected to the admission of the 10 photographs, as well as the 5 photographs from the Edwards County case. The trial court took the matter under advisement.

¶ 20    On October 23, 2020, the trial court entered a written order denying the State's amended motion to admit proof of other crimes, wrongs, or acts without prejudice. The court's denial was based on the State's inclusion of the unauthorized video recording charge. The court found that

7

section 115-7.3 was inapplicable because the legislature omitted the offense of unauthorized video recording.

¶ 21 On November 30, 2020, the State filed a motion to sever the unauthorized video recording charge (count IV) from the remaining charges. The court ultimately granted the State's motion over defendant's objection on March 12, 2021.

¶ 22 On April 13, 2021, the trial court entered an additional written order on the State's amended motion to admit other crimes, wrongs, or acts. The court noted that the State sought to admit the following evidence at trial: the 5 digital images of alleged child pornography that were the bases for the child pornography charges in Edwards County; 10 additional images of child pornography recovered from defendant's cell phone; testimony of Sheftick that he discovered approximately 100 additional images of child pornography on defendant's phone; testimony of Megan Howder regarding allegations of sexual abuse she made against defendant in the 1990s; and testimony of Kristi Emmons regarding allegations of uncharged, unlawful sexual acts defendant committed against her in the 1990s.

¶ 23 The trial court found that the five images recovered from defendant's phone, which were the bases of defendant's charges in Edwards County, were admissible because the images were relevant to demonstrate defendant's desire to possess child pornography and his motive for obtaining the images of R.H. The court also found that the images were taken in close proximity in time to the images in the Wabash County case. The court next found that the five images were sufficiently similar in nature and depiction. In so finding, the court noted that the State represented at the October 9, 2020, hearing that the image of child pornography that formed the basis of count I in Wabash County "was a lewd photograph of [R.H.], a female minor under the age of 13 at the time, wherein her genitals were shown and she was in a 'squatting position.' " The court noted that

the photograph was discovered on the same phone that contained the five images charged in Edwards County. The court found "[s]uch photograph, in and of itself, would be substantially similar to the image charged in the Edwards County case that allegedly depict minor females." The court additionally noted that R.H. was expected to testify as to the allegations in count I "that the Defendant somehow made her appear in an unclothed and lewd manner so that said photograph could be obtained and possessed by the Defendant." The court noted that three of the five images depicted unknown minor females, with the only difference being that R.H. was the known victim and that she was "willing to testify as to her knowledge of the photograph depicting her." The court acknowledged that the admission of the five images of "commercial" pornography currently charged in Edwards County would be inherently prejudicial to defendant at trial; however, the court found that the evidence was also extremely probative in that it "would tend to show the Defendant's intent and absence of mistake or accident in allegedly committing child pornography" against R.H. The court limited the images to "those [three] images that depict a minor female." The court also precluded the State from eliciting testimony that defendant was charged with possession of child pornography in Edwards County.

¶ 24    The trial court denied the State's request to admit the 10 additional images of child pornography, Sheftick's testimony regarding the total number of images of child pornography recovered from defendant's phone, and the testimonial evidence from Megan Howder and Kristi Emmons regarding allegations of previous unlawful sexual acts involving defendant. In doing so, the court found that the probative value of such evidence would be substantially outweighed by the risk of undue prejudice.

¶ 25    On February 15, 2022, the State filed a notice of intent to offer out-of-court statements of the victim pursuant to section 115-10(d) of the Code (725 ILCS 5/115-10(d) (West 2020)). The

9

State specifically sought to offer the statements R.H. made to Kimberly Howder, Megan Howder, and Jessica Howder. The State also sought to offer the statements R.H. made to forensic interviewer Sheryl Woodham during a recorded child advocacy center (CAC) interview. Although the State requested that "a hearing be conducted pursuant to 725 ILCS 5/115-10(b)(1)," the trial court did not hold a hearing to determine the reliability of the statements.

¶ 26                                    B. Trial

¶ 27    On March 7, 2022, defendant's four-day jury trial commenced. At the outset, the State indicated that it planned to introduce a redacted video of R.H.'s CAC interview as evidence in the case. The State explained that the "interview ha[d] been edited by the State for presentation to the jury based on some certain pre-trial rulings made by the Court."[3] The State then stated:

> "We are seeking instruction from you, your Honor. Our intention is to offer both the unedited version and the edited version into evidence but only ask for publication of the edited version to the jury. But we're also—in doing that, the video is choppy. It's clear that it's edited. We're seeking instruction on how to explain that to the jury.
> It's my intention to ask the interviewer whether she viewed the unedited and the edited and if the edited contains the relevant questions and answers as to these allegations. And that's how I would propose we deal with that."

¶ 28    The trial court then asked defense counsel for a response. Defense counsel stated:

> "It's the State's evidence. And we talked about this. If the State wants to introduce or feels like it needs to because of a prior court's ruling, introduce an edited copy of the interview, then I don't—I don't have any objection to doing that, so long as the unedited copy—although I'm not sure why the State would want to admit the unedited copy into evidence if it's not going to publish it to the jury.
> I am not conceding, though, that I can only cross-examine Ms. Woodham, the interviewer, on edited parts of the interview. For instance, if there's inconsistencies in interviews—more than one family member was interviewed by Ms. Woodham that day. I understand the State is not seeking to introduce any other interviews. However, the edited portion of that video that I expect the State is going to publish to the jury does contain statements concerning the second interview and what our minor in this case disclosed or did not disclose considering conduct toward another minor, which may fall in the realm of credibility evidence that could be admissible.

---

[3]It appears that the State is referencing the trial court's April 13, 2021, ruling on the State's motion to admit other-crimes evidence. A different judge presided over defendant's trial.

So I don't object to the State introducing an edited version of the interview to the jury, although that's a little unusual in my experience. However, it's understood that anything that Ms. Woodham heard that would be otherwise admissible, that's a hearsay exception, or otherwise admissible from the minor, even if it's edited out, could be fair game."

Defense counsel expressed his understanding that the CAC interview recording had been edited because there were "statements that were made that specifically [had] been excluded by a prior ruling." Defense counsel noted that the State also edited out statements that were not specifically excluded by a prior court ruling. Defense counsel then indicated that he planned to question Woodham about statements R.H. made during the CAC interview regarding defendant's alleged abuse of A.H., which A.H. denied in a subsequent interview. Defense counsel also stated:

"But I'd also like to make the Court aware, we haven't actually viewed the edited copy. And I imagine your Honor hasn't viewed that either. And so I think we all ought to, at least, have an opportunity to look at that before we put it in front of the jury because it is a modified version of the actual interview."

The trial court ultimately reserved ruling on the admissibility of the CAC interview until "the situation" arose.

¶ 29    During opening arguments, the State asserted that the evidence would show that defendant "committed a number of acts against [R.H.]." The State asserted that defendant committed the offenses of child pornography and aggravated criminal sexual abuse. The State further asserted that the jury would "hear about and see" a statement R.H. gave during a CAC interview "when she describes in even more detail what had been happening to her, including the defendant touching her, having her take pictures of herself and then taking pictures of her." The State asserted that R.H. first made disclosures to her grandmother and aunt in September 2017. The State further asserted:

"You'll hear evidence of the two different ways in which his touching of her rose to the level of aggravated criminal sexual abuse. The first is rubbing his hand on her vagina over her clothes. The second is rubbing his penis over her vagina, again, over her clothes.

11

Those are Counts II and III of the information that you're going to be asked to consider. And while there are two charges associated with these touchings, these are not singular acts. The defendant was abusing his granddaughter on a continuing basis over a period of time and hiding it from everyone else."

¶ 30    The State further asserted that R.H. would testify that defendant used "his phone to take pictures of her, naked in different settings and poses." The State also asserted that R.H. would testify that defendant instructed R.H. "to go into the bathroom, take off her pants or underwear, crouch over that phone and take a picture of her unclothed vagina, crouching over it and creating that lewd exhibition of the genitals of a child under the age of 13." According to the State, R.H. would testify "about seeing some images of herself on his phone and him deleting those images." The State claimed that the evidence would show defendant possessed multiple phones, including "a clean phone" and "a dirty phone." The State asserted that one of defendant's phones contained child pornography. The State then stated:

"The physical evidence, unfortunately, is not going to show those images of [R.H.] that the defendant either took or had her take of herself. We can't visually show you everything that happened in this case because, as you'll hear from both [R.H.] and the forensic examiner, there was a deletion taking place, up to and including September 11 of 2017 when those phones were being seized on the 11th and 12th for examination.

Now, what we are able to show you is a photo in a cached space of the defendant's phone. *** And what eventually you're going to be shown is a photograph that is visually similar to that crouching-over picture of her vagina that [R.H.] is going to testify to. Because you see only the vagina and the upper legs and not any other part of the body or the face, we can't say for certain that's the same picture that [R.H.] was asked to take of herself.

You're going to hear testimony about the creation of that picture and be asked to find that the defendant had [R.H.] take a picture of her vagina, a picture that showed the lewd exhibition of the unclothed genitals of a female child under the age of 13."

¶ 31    During his opening statement, defense counsel stated that defendant's ex-wife, Kimberly Howder, disliked defendant and became jealous when he spent more time with their grandchildren. Defense counsel noted that R.H. first made an accusation against defendant to Kimberly when no one else was present. Defense counsel posited that Kimberly convinced her daughter, Megan

12

Howder, and daughter-in-law, Jessica Howder, "to go along with it and to coach this child." According to defense counsel, the jury was "going to hear changes in [R.H.'s] story as it keeps going down the line, sort of like the game of telephone." Defense counsel denied that defendant committed any of the charged offenses, noting that he voluntarily complied with police. Defense counsel asserted that the evidence would show that R.H.'s story appeared rehearsed. Defense counsel also advised that the jury would view uncomfortable photographs. Defense counsel stated:

> "I think what you're going to see is a shaved adult vagina in that picture. And it's not going to be clear whether or not that picture even came from one of [defendant's] phones or from somewhere else. You've already heard [the State] in [its] opening statement say at one point he took pictures of [R.H.] nude and videos of [R.H.] nude. And, by the way, I don't expect you're going to hear any credible testimony that he ever took a nude photograph of [R.H.], ever."

¶ 32    Following opening statements, the State called its first witness, R.H., to testify. R.H. testified that she was 15 years old at the time of the trial. While R.H.'s parents worked, defendant babysat R.H. and her siblings at their home in Allendale, Illinois. R.H. recalled that she was 9 to 10 years old when defendant babysat. R.H. had also been to defendant's home in Albion, Illinois, and had stayed the night there. R.H. observed defendant using two black, touch screen cell phones when he babysat her. R.H. explained that defendant used his "newer" cell phone for "calls and stuff" and used his other phone for "other things."

¶ 33    R.H. testified that she did "fun things" and "not fun things" when defendant babysat. When asked to elaborate about the "not fun things," R.H. explained that defendant would have her take pictures of her "private areas." R.H. clarified that her private areas were her "[n]aked body." R.H. claimed that defendant had her take the pictures on his older phone at her home in Allendale. R.H. took the photographs in a "bathroom or a room." Defendant was either with R.H. or with her siblings when R.H. took the pictures. Defendant showed R.H. how to take pictures with his old phone. Specifically, defendant "told [R.H.] to put it on the floor and squat over it." When asked if

13

she was wearing any clothes when she squatted over the phone, R.H. responded, "No." R.H. could see what was on the phone when she took the pictures. Specifically, R.H. could see that the camera was showing her "private area." When asked if she referred to her vagina as her private area, R.H. responded, "Yes." R.H. also responded in the affirmative when asked if her vagina was naked. R.H. claimed that she photographed herself more than once. When asked to explain how she took the pictures while squatting over the phone, R.H. responded, "I'd lean over and tap the picture button." Defendant never told R.H. why he wanted the photographs.

¶ 34    The following colloquy then took place between the State and R.H.:

> "Q. Did you ever see those pictures of you squatting over the phone which showed your vagina? Did you ever see those pictures after you had taken them?
> A. Yes.
> Q. And how would that be?
> A. I'm not sure what you're asking.
> Q. You indicated you would see those pictures after they were taken. How was it that you saw them after they were taken?
> A. I'd play with his phone every now and then.
> Q. And which phone are we talking about?
> A. The older one.
>                                                * * *
> Q. And so when you were accessing those apps on that phone, how would you see the pictures?
> A. I would get off it and look through pictures.
> Q. And did you observe or did you see the pictures you had taken while squatting over the phone?
> A. Yes.
> Q. You also said that sometimes [defendant] would take the pictures while [you were] squatting over the phone; is that correct?
> A. Yes.
> Q. And how would he do that?
> A. He would hold it over me and take the picture.
> Q. When you say he would hold it over you, where were you at?
> A. The bed."

¶ 35    R.H. testified that she was lying naked on her back on her mother's bed when defendant took the photographs. Defendant was standing above her by her legs when he took the pictures. When asked if she could tell what part of her body defendant's phone was aimed towards, R.H.

14

responded, "My private area." R.H. clarified that she was referring to her unclothed vagina. R.H. also viewed the photographs defendant took of her on the bed when she played on defendant's phone. When asked what part of her body was depicted in the picture, R.H. responded, "My private area or upper." R.H. agreed that there were pictures of her naked breasts and her naked vagina. R.H. also took naked photographs of herself on defendant's phone in her own bed. R.H. agreed that her naked vagina was depicted in those photographs. R.H. also viewed these photographs on defendant's phone. R.H. also recalled that defendant took a video of her on his phone.

¶ 36    The following colloquy then took place between the State and R.H.:

> "Q. So I had asked if there were ever videos taken of you by [defendant]. And you said yes. And I believe you indicated it was in your mother's room; is that what you said?
> A. Yes.
> Q. Can you just tell me where in the room you were?
> A. On the bed.
> Q. And would you have any clothes on?
> A. No.
> Q. And how would you be positioned on the bed?
> A. Laid down.
> Q. And would your head be on the bed?
> A. Yes.
> Q. Would your butt be on the bed?
> A. Yeah.
> Q. And are you on your back?
> A. Yes.
> Q. And where are your legs? Are they on the bed?
> A. No.
> Q. Where would your legs be?
> A. He had me put them on his shoulders.
> Q. So your legs would be on [defendant's] shoulders?
> A. Yes.
> Q. And would you be wearing any clothes?
> A. No.
> Q. And would he be holding a phone?
> A. Yes.
> Q. Do you know where the phone was pointed in relation to you?
> A. My private area.
> Q. And when you say your private area, are you talking about your vagina?
> A. Yes.
> Q. And did you ever see those pictures after they were taken?

15

A. I can't remember.

Q. Was he saying anything to you when you're laying on the bed with your legs on his shoulders?

A. Not that I can remember.

Q. And I just want to be clear. So you're laying on the bed. You said your legs are on his shoulders. Is he standing, or is he on the bed?

A. He's standing.

Q. And is his face facing your face?

A. Yes.

Q. And what are his hands doing when this is happening?

A. He has his phone taking pictures.

Q. Are there—do you know if it was pictures or a video? You said you didn't see it. Do you know if it was pictures or a video?

A. It might have been both. I don't know."

¶ 37    R.H. also testified that defendant touched her when he babysat. R.H. recalled that the touching occurred in the bedroom and front room at her house in Allendale. The touching occurred when R.H. sat on defendant's lap. R.H. and defendant were fully clothed when the touching occurred. R.H. explained that defendant "would move his hand up [her] thigh to [her] private area," meaning her vagina. When asked what defendant did with his hand when he moved it there, R.H. responded, "He would rub." R.H. recalled that defendant used his fingers and palm to rub her. The rubbing occurred more than once. R.H. also recalled that when the touching occurred in a bedroom, defendant used one hand to rub R.H. and one hand to rub himself in an up-and-down motion through his pants. R.H. denied that she saw defendant's penis. When asked if defendant ever touched R.H.'s private area with any other part of his body, R.H. responded, "No." The touching also occurred at defendant's house in Albion. In addition, defendant used his hand to touch her private area over clothing while he was driving a car.

¶ 38    R.H. testified that there was a time when the photographs she had seen on defendant's old phone were no longer there. When asked if that was after she had seen the photographs on the phone, R.H. responded, "Yes." R.H. did not know how the images disappeared. R.H. never observed defendant looking at the pictures.

16

¶ 39 R.H. testified that she had a close relationship with her grandma, Kimberly Howder, and aunt, Megan Howder. She stayed with her grandma every other Friday. R.H. recalled telling her grandma and aunt "something" about defendant that made them angry and sad. R.H. did not recall the specifics of the conversation but agreed the conversation was similar to the testimony she provided that day. When asked why she never told anyone about defendant before, R.H. responded, "I had thought it was a normal thing."

¶ 40 On cross-examination, defense counsel questioned R.H. regarding the incident where defendant allegedly took a video of R.H. without her clothes on. When defense counsel asked if "[t]oday is the first time [R.H. had] told anybody that story," R.H. responded, "Yes." R.H. agreed that she talked to Sheryl Woodham to help her get her "story straight." R.H. did not tell Woodham about the video incident because it was "more recent," and R.H. was "more nervous talking about it." R.H. also did not tell her grandma or aunt about the incident. R.H. admitted that she first told the State about the incident a week before the trial. The following colloquy then took place between defense counsel and R.H.:

> "Q. [The State] asked you if [defendant] ever touched your vagina with his—or touched his penis to your vagina while you guys both had clothes on, and you said no, he never did that. Do you remember that? That was just here a little while ago?
> A. Yes.
> Q. Do you remember if you told Sheryl something different when you talked to her?
> A. I do not.
> Q. But you're saying today that that never happened? He never touched his penis to your vagina with clothes on? It was just touching with his hand? Is that what you're saying?
> A. Yes."

¶ 41 R.H. agreed that she began using Facebook around age 11 when she was in the sixth grade. R.H. looked "through everybody's posts" on Facebook, including the posts of adults. R.H. knew that her grandma, defendant's ex-wife, did not like defendant. When asked what prompted R.H. to

17

discuss defendant with her grandmother, R.H. responded that she had told Kimberly she had plans to spend the night with him. R.H. did not recall telling her grandmother that she was sleeping with defendant. R.H. agreed that she never slept in the same bed as defendant. Defense counsel then asked, "And when you blurted out whatever you blurted out when you said that you would be spending the night with him, she blurted out to you that he's a sexual predator, didn't she?" R.H. responded, "No." R.H. denied that her grandmother called defendant a sexual predator or sex offender. R.H. denied telling Sheryl Woodham that her grandmother called defendant such names. R.H. could not recall the last time she saw defendant, but she believed it was when he babysat her. R.H. agreed that she and her siblings made sexual comments "just kind of joking" for fun.

¶ 42    Defense counsel next questioned R.H. regarding her testimony that defendant asked her to squat over his phone and take photographs of her vagina. R.H. testified that this occurred more than 10 times. When defense counsel asked R.H. what instructions defendant gave her, R.H. responded, "I am not sure." The following colloquy then took place between defense counsel and R.H.:

> "Q. You're not sure because you did that on your own, didn't you?
> A. I did not.
> Q. You testified earlier that you and your sibling, [A.H.], specifically, right, would have [defendant's] old phone and play on it, right?
> A. Correct.
> Q. So you used his old phone to play around? You said on apps, right?
> A. Uh-huh.
> Q. But not just apps? Whether it was sexual or not, it is true, isn't it, that you would take photos and videos messing around with the phone, not only you but [A.H.], as well, right?
> A. Yeah.
> Q. And how often would you do that? You played on his phone more than once, right?
> A. Yeah."

R.H. explained that she used defendant's phone because she did not always have her phone. When asked if defendant caught her taking pictures on his phone more than once while he was

babysitting, R.H. responded, "That depends on what you mean." Defense counsel asked R.H. if she remembered defendant telling her father that the children "were taking videos of each other's butts," and R.H. responded, "I do not." R.H. recalled using defendant's phone to text her mother to ask if she could spend the night at defendant's house. R.H. pretended to be defendant "[t]o have fun with [her] mom." R.H. denied that she told her grandmother that defendant was touching her privates as a joke.

¶ 43    When defense counsel asked R.H. how she learned the phrase "sexual predator," R.H. stated that she "learned it after a man tried to friend [her] on Facebook." R.H. explained that she asked her mother if she knew the person and R.H.'s mother told her "not to friend them back because it could be a sexual predator." R.H. denied ever using the phrase "sex offender."

¶ 44    Defense counsel next asked R.H. if she remembered telling Sheryl Woodham that she had seen defendant touch A.H.'s privates, and R.H. responded, "Yes." Defense counsel then asked if R.H. could have been wrong about that or if she was "going to stand on that as the truth still" that day, and R.H. responded, "I am going to stand for that."

¶ 45    The State next called Megan Howder to testify. Megan testified that defendant was her father but she no longer had a meaningful relationship with him. She last contacted him six or seven years prior to trial. R.H. was Megan's niece. Megan had a good relationship with R.H., and Megan saw R.H. once a week in 2017. Megan saw R.H. three or four times a week at the time of trial. Megan lived with Kimberly at the time of trial, and she believed she lived with Kimberly in 2017.

¶ 46    Megan testified regarding certain statements R.H. made to her on September 8, 2017. Kimberly called Megan and asked Megan to talk to R.H. Megan arrived at Kimberly's house during the evening hours and spoke with R.H. inside of Kimberly's house. Kimberly was not in

19

the room when Megan spoke with R.H. Megan acknowledged that she knew why Kimberly asked her to talk to R.H. before she arrived. According to Megan, R.H. "seemed nervous" and her voice was "shaky." When the State asked Megan what R.H. told her, Megan responded, "I don't know how you want me to answer this."

¶ 47 The State asked for a brief recess to instruct Megan on the trial court's prior rulings, and defense counsel renewed his objection that Megan had "no probative value to this case whatsoever." The trial court overruled defense counsel's objection.

¶ 48 Following the recess, Megan testified that R.H. told her that defendant "had touched [R.H.] in [R.H.'s] private areas." R.H. specified that defendant "touched her vaginal area above her clothing." R.H. also advised Megan that defendant "asked her to go to the restroom and take his phone and to place it on the floor with the camera up and take a picture of her private areas." R.H. further advised that defendant's actions began when R.H. was nine years old and took place at R.H.'s home in Allendale. R.H. explained to Megan that defendant allowed R.H. to stay up later than her siblings and "everybody was in bed after all this happened." Megan spoke with police the day after she spoke with R.H.

¶ 49 On cross-examination, Megan testified that R.H. made no other disclosures to her on September 8, 2017. Specifically, she denied that R.H. told her "anything about being on the bed with [defendant] and him getting on top of her," "anything about [defendant] videotaping [R.H.] naked on the bed with her legs up on his shoulders," or "anything about him putting his hand on her crotch while they were driving around." Megan also clarified that R.H. advised her that the incidents involving defendant occurred several times.

¶ 50 Prior to the presentation of evidence the following day, defense counsel filed an amended witness list to include Sheryl Woodham and A.H., along with an exhibit list that included A.H.'s

20

CAC interview. The State, in turn, filed a motion *in limine* to bar testimony concerning the abuse of A.H. and to deny the admission of A.H.'s CAC interview. The State alleged that defense counsel intended "to impeach [R.H.] by showing that [R.H.]'s assertions that [A.H.] was abused by Defendant in a similar way to [R.H.] [were] uncorroborated." The State asserted that defendant's alleged abuse of A.H. was a collateral issue that would "create a trial within the trial." The State alleged that the issue of whether defendant touched A.H. was "wholly unrelated to the question of whether Defendant committed the charged offenses against [R.H.]." The State further alleged that testimony by Sheryl Woodham concerning A.H.'s out-of-court statements and the out-of-court statements A.H. made in the CAC interview would be inadmissible hearsay under section 115-10 because A.H. was "not the victim herein." Thus, the State requested that the trial court bar defendant from questioning A.H. regarding defendant's alleged abuse of A.H., bar defendant from questioning Sheryl Woodham regarding A.H.'s interview, and deny admission of A.H.'s CAC interview. Defense counsel argued that A.H.'s nondisclosure was exculpatory evidence because R.H.'s credibility was at issue and barring such evidence would hamper defendant's defense. The trial court ruled that defense counsel could not introduce A.H.'s CAC interview or call A.H. to testify.

¶ 51   Sheryl Woodham next testified regarding the CAC interview she conducted with R.H. on September 11, 2017. Woodham explained that a child witness may make a disclosure and later recant the disclosure for a number of reasons, including family influence or a potential change in the family dynamic. Woodham noted that a recantation may occur if the child's family reacted negatively to the disclosure. Woodham acknowledged that R.H. did not report any threats and that she did not delve into R.H.'s family dynamics outside R.H.'s immediate family and relationship with defendant.

21

¶ 52    Through Woodham's testimony, the State also introduced a redacted video recording of R.H.'s CAC interview. The State noted that it edited the video recording to remove portions irrelevant to the accusations against defendant. The trial court admitted the redacted and unredacted versions of the CAC interview into evidence. The redacted version of the CAC interview was published to the jury over defense counsel's objection based on lack of foundation.

¶ 53    During the CAC interview, R.H. stated that she came for an interview because she "just blurted something out" while talking with Kimberly Howder. R.H. knew she discussed defendant with her grandmother, but she was initially unable to recall the specifics of their conversation. R.H. then recalled telling Kimberly that defendant was "touching [her] crotch" at her house and in the car while defendant was driving. R.H. could not recall where the touching first began, but she recalled that it began when she was nine years old.

¶ 54    During the interview, R.H. recounted that defendant first touched her when she was lying on her bed. R.H. explained that defendant came in and laid on top of her while both were wearing clothes. R.H. further explained that defendant "just lays down on [her] to where his wiener touches [her] vagina." R.H. confirmed that defendant did not remove his clothes and that she never saw defendant's "wiener" come out of his pants. R.H. advised Woodham that defendant then began using his hand to touch her clothed vagina. Defendant never attempted to take off R.H.'s pants and never requested that R.H. take her pants off. According to R.H., defendant touched her in this way every time he saw her. R.H. clarified that she "rarely" saw defendant.

¶ 55    During the interview, R.H. also advised Woodham that defendant would "get [her] to take pictures of [her]self." R.H. recalled that defendant told her to put his phone camera down and to "squat over it and take a picture." R.H. also took pictures of her "vagina and up" without defendant advising her to pose in any particular way. Defendant last requested a photo when R.H. was 10

22

years old. R.H. also advised Woodham that defendant took a video of her after she took a shower. R.H. found the videos when she looked through defendant's phone. According to R.H., defendant deleted the videos after she saw them. Defendant used only one phone for the videos because it was "like private where no one could get into it."

¶ 56    R.H. told Woodham during the interview that she had not told anyone about defendant's actions for two years but that she felt "a little bit" better after talking about it. R.H. did not tell anyone for two years because she was afraid. R.H. thought that defendant might be a "sexual predator" after she discussed a potential sexual predator on Facebook with her mother. At the time of the interview, R.H. did not like defendant because she felt he was a "sexual offender" or "sexual predator." R.H.'s family did not like defendant and told her to "stay away from him."

¶ 57    The State next called Richard White to testify. White was employed as a sergeant in the Division of Internal Investigations at the Illinois State Police (ISP). White assisted in an interview with defendant in Wabash County on September 12, 2017. Prior to conducting the interview, White reviewed the recording of R.H.'s CAC interview. The interview with defendant was audio and video recorded. Defendant advised White that he had multiple phones and that he did not have pornography on the phone he used around his grandchildren. Defendant advised that he did have pornography on other phones. Defendant claimed that he did not take the phones containing pornography around his grandchildren. When asked about the images of "the kids or grandkids on his phone," defendant advised White that his grandchildren snuck on his phone and took naked pictures of each other with his phone without his knowledge. When White asked if defendant had seen those photographs on his phone, defendant advised that he had not looked closely but had seen their "butts on there." Defendant advised White that he had previously threatened to tell the children's father and his son, Matthew Howder, about the photographs.

23

¶ 58 White testified that he confronted defendant about R.H.'s allegation that he had touched her vagina while driving in the car. According to White, defendant was nonresponsive and stated that he was never in the car with his grandchildren. White testified that defendant acknowledged that he "might have slapped her on the leg a little bit, patted her on the—the leg." White claimed that defendant followed up by stating that it would have been difficult to touch R.H. in the car because there was a gearshift and a console. Defendant advised White that he babysat R.H. and had been alone with her in the three to four weeks prior to the interview.

¶ 59 On cross-examination, White testified that defendant did not admit to touching or photographing R.H. during the interview. White also agreed that defendant voluntarily turned over his cell phones to law enforcement during the interview. White agreed that defendant was not placed under arrest after the interview and that he was free to leave.

¶ 60 The State's final witness was Mark Sheftick, who testified that he was employed as a digital forensic examiner from the ISP Digital Crimes Unit. At the time of trial, Sheftick had worked as a digital forensic examiner for 4½ years. He previously worked as a crime scene illustrator for the ISP for 15 years. Sheftick spent a year setting up employee desktop computers before he became a crime scene illustrator. Sheftick had 4½ years of experience as a digital forensic examiner for the ISP, during which time he worked on 13 child pornography cases.

¶ 61 When Sheftick reviewed cases of suspected child pornography, he reviewed the images and labeled them as "probable" or "possible" child pornography. If he labeled the image as "probable" child pornography, he believed the image depicted a prepubescent child, or a child not having reached puberty. If he labeled the image as "possible" child pornography, he believed the image depicted a pubescent child under 18.

¶ 62    Sheftick examined the cell phones law enforcement recovered from defendant. Sheftick obtained defendant's cell phones and made copies of the data contained therein. The data consisted of two forms, "allocated" files and "unallocated" files. The allocated files consisted of data that the device's operating system was currently using, while unallocated files consisted of inactive data or files that had been deleted. Sheftick explained that he could view some deleted files unless the files were overwritten by new data the device needed to store.

¶ 63    Sheftick identified a Samsung Galaxy S4 Mini mobile phone as one of the phones he examined. The phone was not used for phone calls, texts, or other "typical phone activity." Sheftick found images of both adult and child pornography on the phone. Sheftick's determination that the phone contained both types of pornography was based on his own impressions of the images. Sheftick recovered the images of child pornography from the phone's allocated space in two places, the Gallery app and the Google+ app. The images were cached images, or smaller versions of larger image files, which helped the images load faster.

¶ 64    Sheftick identified a hard copy of an image he recovered from defendant's Galaxy S4 Mini cell phone (Exhibit 4). The image was "from the image cache and a visually similar version was located in the Google+ cache." Sheftick described the photograph as an image of "the vagina of a prepubescent female." The timestamp associated with the image in Google+ was June 25, 2017, but Sheftick agreed that was not necessarily the date the image was created or taken. Sheftick could not state when the photograph was taken, where the photograph was taken, who the photograph depicted, or whether the photograph was taken with the cell phone or downloaded from the internet.

¶ 65    When the State attempted to introduce Exhibit 4 into evidence, defense counsel objected "on the basis of lack of foundation and no authenticity." Defense counsel noted that R.H. did not

25

testify that Exhibit 4 depicted her and that Sheftick could not testify regarding the origin or subject of the photograph. Defense counsel further noted that the State did not seek to admit Exhibit 4 as other-crimes evidence. Defense counsel noted that "the purpose of its admission would be that it would go to Count I of the information, and there is just not enough information for the Court to be able to submit that—that to the jury."

¶ 66 The State responded that R.H. "described how she used this phone to crouch over in a bathroom on multiple occasions and take a picture that was essentially a close-up of her vaginal area, which is what's depicted in this photograph." The State acknowledged that Sheftick could not state that the phone was used to take the photograph but argued "we also can't say it wasn't taken with the phone." The State noted that defense counsel's arguments "would go to the weight of that image, not as to its admissibility."

¶ 67 Defense counsel countered that "this goes directly to admissibility because if it can't be authenticated and it's hearsay and there's no non-hearsay purpose, it definitely goes to the truth of the matter asserted." Defense counsel claimed that the State's inability to authenticate the photograph made the photograph inadmissible hearsay. The State responded that it was "not trying to authenticate [the photograph] in the sense of we are saying this is R[.H.]. We are authenticating this as an image of child pornography that is visually similar to the testimony she describes in creating child pornography at the defendant's request." The trial court overruled defense counsel's objection and admitted Exhibit 4 into evidence at trial.

¶ 68 Sheftick next identified hard copies of two images of potential child pornography that he recovered from defendant's phone (Exhibits 5 and 6).[4] Sheftick found the images in defendant's

[4]Prior to Sheftick's testimony, defense counsel renewed his objection to the admission of the three exhibits containing the images that were the bases of the charges in Edwards County (Exhibits 5, 6, and 7). The trial court ultimately ruled that Exhibit 7, which depicted a young female with a penis in her mouth, was inadmissible because its prejudicial value outweighed its probative value.

"Gallery app." Sheftick testified that Exhibit 5 depicted "a pubescent female with exposed breasts." Sheftick noted that the female was "wearing underwear and appears to have shorts down around her ankles." Sheftick testified that Exhibit 6 depicted "a prepubescent female that [was] naked." Sheftick could not tell where the images came from, how long they had been on defendant's phone, or whether they came from a commercial website. Defense counsel renewed his pretrial objection to the admission of Exhibits 5 and 6 "because any probative value these might have would be substantially outweighed by any undue prejudice or confusion to our jury for the reasons that were stated previously in light of what he is charged with." The trial court clarified that it admitted Exhibits 5 and 6 over defense counsel's objection based upon the court's prior April 13, 2021, ruling on the State's motion to admit other-crimes evidence.

¶ 69    Sheftick testified that he reexamined defendant's phone eight months after his initial examination at the request of the Attorney General's office. Sheftick noted some "deletion activity" of image files that occurred from September 8 to September 11, 2017. Sheftick could not tell what files were deleted. Based on Sheftick's testimony, all three photograph exhibits (Exhibits 4, 5, and 6) were published to the jury.

¶ 70    The State rested following Sheftick's testimony, and defense counsel made a motion for a directed finding as to all three counts. Regarding count III, counsel argued that the "specific conduct" that needed to be proven beyond a reasonable doubt was that defendant touched his "private parts, his genitalia" to R.H.'s "genitalia" through her clothes. Counsel argued that R.H. denied that defendant touched his penis to her vagina through clothing when she testified at trial. According to counsel, "[t]hat [was] a material *** proposition that goes to the element—an element of the charged offense." Regarding count II, defense counsel argued that the State failed to meet its burden on the element of sexual gratification or arousal. Counsel noted that R.H.'s

testimony was vague, inconsistent, and unsubstantial in key, specific areas. Thus, counsel asserted that no reasonable juror could convict defendant on count II. Regarding count I, defense counsel argued that no one identified Exhibit 4 as a photograph of R.H., and that any conviction on count I would be based solely on other-crimes evidence. Thus, counsel argued that a reasonable jury could not find defendant guilty beyond a reasonable doubt on all three counts.

¶ 71     Regarding count III, the State argued that the CAC interview, in which R.H. stated that defendant touched his penis to her vagina through clothing, was admitted as substantive evidence. The State noted that "[i]t would be solely the jury's decision as to which disclosure, whether in the interview or in Court, they believe." Regarding count II, the State noted that R.H. testified that defendant touched himself while touching R.H.'s vagina, satisfying the sexual gratification or arousal element. Regarding count I, the State agreed that it had "never maintained that [it] [was] able to prove beyond a reasonable doubt that the remaining cached photograph [was], in fact, one of the photographs of [R.H.]." However, the State argued that Exhibit 4 was similar enough to the circumstances R.H. described during her testimony. The State argued that, even if the image did not depict R.H., "her testimony alone [could] provide the evidence to withstand a conviction on that count." Thus, the State asked that the trial court deny the defense's motion.

¶ 72     After considering the parties' arguments, the trial court found, with regard to count III, that "there was testimony in the [CAC interview] that would support that allegation, and so in a light most favorable to the State, a reasonable trier of fact could fairly find the defendant guilty beyond a reasonable doubt." Regarding count II, the court found that there was testimony that defendant touched himself and, thus, a reasonable jury could have found defendant guilty beyond a reasonable doubt. Regarding count I, the court found that "the testimony of the witness could support the Court finding that the images [R.H.] described that would've been taken by her or by

28

the defendant in an objective light could be considered lewd, and, also, that they could constitute child pornography." Thus, the court denied defendant's motion.

¶ 73 Defendant then testified on his own behalf. Defendant was 59 years old at the time of the trial. Defendant babysat R.H. and her siblings two to three times per week beginning at the end of 2016 through March 2017. Defendant continued to have contact with the children but decided to stop babysitting them after March 2017. Defendant denied touching R.H.'s crotch or vaginal area and claimed he never had her touch him inappropriately. Defendant denied taking photographs of R.H. without her clothes on and denied that he asked R.H. to take photographs of herself squatting over his phone in the bathroom. Defendant denied lying on a bed with R.H. with his penis area on her vagina. Defendant agreed that the children occasionally bathed while he babysat, but he denied taking any pictures of the children while they bathed.

¶ 74 Defendant testified that he occasionally looked at adult pornography on his phone. He claimed he began looking at adult pornography after his divorce and continued looking at the pornography for six months to a year. Defendant lost interest in pornography when he started dating again. Defendant agreed that he may have looked at the old pornography on his phone after he began dating, but he claimed he did not look up new pornography online after 2014. Defendant denied that he attempted to find "kiddy porn" or child pornography. He also denied that videos, photographs, or pictures of children aroused him sexually. Defendant denied that he was a child molester or pedophile.

¶ 75 Defendant then viewed Exhibit 4 and denied that the image was taken with his phone. When asked if the image disgusted him, he responded, "Yes." Defendant did not recall seeing that image on his phone. Defendant also viewed Exhibits 5 and 6, and he denied seeing those images on his phone. Defendant also denied that he enjoyed looking at the images.

29

¶ 76    On cross-examination, defendant testified that he did not know how the images depicted in Exhibits 4, 5, and 6 came to be on his phone. When asked if the faces depicted in the images in Exhibits 5 and 6 appeared to be adults or children, defendant responded, "They looked like children to me." When the State asked how the photographs came to be on his phone, defendant responded, "The only way I know is when I was looking on Pornhub." Defendant agreed that he occasionally looked at the pornography that was already on his phone between 2014 and 2017. Defendant claimed that he did not let the children use or look at his "old" phone. When defendant was asked why Exhibit 4 was cached on June 25, 2017, defendant stated, "No idea unless I was deleting stuff or going—I don't know. I have no idea."

¶ 77    The defense rested following defendant's testimony and renewed the motion for a directed verdict. Defense counsel rested on the arguments previously made. Regarding count III, the State noted that "[t]he CAC interview is substantive evidence just as witness testimony is substantive evidence, and I renew my arguments regarding the sexual conduct aspects of Count II and III." The State also relied on arguments previously made regarding count I. The trial court denied the motion.

¶ 78    During closing arguments, the State noted that, to sustain the charge of child pornography, it was required to prove two propositions—"that the defendant solicited, used, persuaded, induced, enticed, or coerced [R.H.], who he knows or reasonably should know to be under the age of 13, to appear in a photograph" and that the "child was depicted in a pose involving a lewd exhibition of the unclothed genitals of the child." The State asserted that R.H. testified in detail regarding "how she was directed, how she was persuaded, and used to use the defendant's porn phone to take pictures of her naked vagina while she squatted over the phone." The State also recounted R.H.'s testimony that defendant photographed her while she was lying on the bed naked. The State noted

30

that "the purpose of her squatting over the phone to take those photographs could only be a lewd one." The State clarified that it did not have to present evidence of a photograph and that it could prove the existence of the photograph through testimony.

¶ 79    The State recounted R.H.'s testimony that defendant directed her to take naked photographs of herself on defendant's phone. The State then stated:

"The photo shown to you, Exhibit 4, the naked vagina of a prepubescent girl cannot be definitively identified as [R.H.]. There's not a face in it. There's not a distinguishing mark. But is it similar to the photograph she described him taking? You bet. And according to Mark Sheftick, that Exhibit 4 was cached on the phone on June 25, 2017. What's the odds? That's our time frame. Maybe it's her, maybe it's not, but it doesn't matter."

The State also noted that R.H. and Sheftick's testimonies demonstrated that defendant deleted images or files from his cell phone before the phone was examined.

¶ 80    Regarding counts II and III, the State noted that, to sustain the charges of aggravated criminal sexual abuse, it was required to prove that defendant committed an act of sexual conduct with R.H., that R.H. was under the age of 18 when the act was committed, and that defendant was a family member. The State maintained that the evidence clearly established that R.H. was under the age of 18 and that she was a family member of defendant. The State then stated:

"So to the first proposition, when it comes to Count II, the allegation is that his hand fondled her vagina. You will be given an instruction on what sexual conduct is. So back here, first proposition, did he commit an act of sexual conduct? Here's what sexual conduct is. The term sexual conduct means any intentional or knowing touching or fondling by the accused, either directly or through the clothing, over the clothing, of the sex organ, anus, or breast of the victim for the purpose of sexual gratification or arousal of the victim or the accused.
        So, first, when he touched his hands [to] his granddaughter's vagina, was it intentional or knowing? Well, how did that happen? She told you—she told [Woodham], as well—she said that they'd be laying in bed, and he would use his hand to touch her vagina. They would be in the car. He would reach over while he was driving with one hand and touch her vagina. Or she would be sitting on his lap and he would reach and touch her vagina. That's certainly intentional. It's not an accident.
        Was it for sexual gratification or arousal of either her or him? When [R.H.] testified, she told you about him touching himself when this was happening, and she described it. She said it was an up and down motion. And when you watch the [CAC] video, you saw

31

her make that motion. It was definitely for his sexual gratification. Why is he touching himself when he's doing that if it's not? So Count II is proven.

Second, it's been alleged that the defendant touched his penis to [R.H.]'s vagina through her clothing. And before I go through the sexual conduct analysis on this count, I want to acknowledge that, yes, [R.H.] initially made this disclosure to Sheryl Woodham, and when she came in here in front of all of us, she didn't say it. She was asked, and she didn't say it. So what—what does that mean? When an adult male touches his private parts to a minor female's private part? It's egregious. It's one of the more egregious things she's disclosed. And in turn, do you think that would be harder to talk about? We're in a courtroom. It's a combative setting. You've seen it. It's been tense in here. There's hard questions asked. The person answering the questions is a child. She's on the spot. People are looking at her. We're hanging on her every word. She's in here to talk about things that would be difficult for an adult to talk about. Is there something especially hard about that to talk about? I don't know. But you're the trier of fact. You've seen the video. And here's the thing. The video is evidence just like her testimony is evidence. It's the same for your purposes. You consider it in the same way. So it's your decision. You're the trier of fact. You'll determine if that happened.

\* \* \*

So ladies and gentlemen, that's [*sic*] the laws that applies to the facts. When you think about this, it's really simple. If you believe [R.H.], then he's guilty."

¶ 81    The State noted that R.H.'s testimony was corroborated by other evidence. Specifically, her testimony that defendant babysat her, she rode in a car with defendant, defendant had two phones, and that one phone contained the naked photographs of her. The State noted that Sheryl Woodham's testimony also corroborated R.H.'s testimony. The State noted that defendant had a photograph on his phone that was similar to the photograph R.H. described taking of herself, as well as "two images of underage girls."

¶ 82    Defense counsel argued that R.H.'s testimony demonstrated that she met with Woodham in the CAC interview "so that they could all get their stories straight." Counsel reminded the jury that R.H. "flat-out" denied the allegations that defendant's penis touched R.H.'s vagina through clothing, as alleged in count III. Counsel also pointed out that Sheftick could not state that defendant took the photograph depicted in Exhibit 4 or if defendant downloaded the photograph from the internet. Defense counsel argued that the State asked the jury to "convict [defendant] based on assumptions."

32

¶ 83    On March 10, 2022, after the trial court instructed the jury, the jury found defendant guilty of all three counts.

¶ 84                                                C. Sentencing

¶ 85    On April 25, 2022, the trial court held a sentencing hearing. The court began by stating that it would not consider the pending charges in Edwards County in imposing defendant's sentence. The State then presented evidence in aggravation.

¶ 86    The State submitted the presentence investigation (PSI) report filed with the trial court on April 12, 2022, as well as a psychosexual risk assessment. The PSI and risk assessment indicated that defendant was diagnosed with pedophilic disorder and had a 2.8% five-year sexual recidivism risk, a below-average risk. Defendant also had high scores for the following: irresponsibility, which indicated that he denied responsibility for his criminal activity and denied hurting others through his behavior; manipulativeness, which reflected an endorsement of getting his way with others, conning others, and being able to lie without detection; and impulsivity, which reflected an endorsement of acting without thinking, engaging in impulsive decision making, and having low impulse control. The PSI report additionally indicated that defendant's criminal history included a 1981 unlawful consumption of alcohol by a minor offense, as well as a 1992 disorderly conduct offense.

¶ 87    The State called Mark Sheftick, who testified that he recovered 135 images of child pornography, or child sexual abuse material, from defendant's cell phone. Sheftick testified that the majority of the images portrayed females, ranging from 10 to 14 in age. On cross-examination, defense counsel asked Sheftick what the basis was for his testimony that the images contained minors, and Sheftick responded, "Just my experience."

¶ 88    The defense then presented evidence in mitigation. The defense called multiple family members of defendant who testified that defendant had a good character and cared for his family. Several family members testified regarding their belief that defendant had not committed the offenses for which he was convicted. Several family members testified that defendant had cared for, or been in contact with, their children without issue. One witness testified that she stayed alone with defendant when she was eight or nine years old without issue.

¶ 89    The State argued that multiple factors in aggravation applied. The State asserted that defendant's conduct caused or threatened serious harm. The State noted that defendant had a history of prior delinquency or criminal activity, as reflected in the PSI report. The State noted that the PSI report indicated that defendant's daughter, Megan Howder, reported that defendant sexually abused her when she was 6 to 11 years old. The State further noted that the sentence was necessary to deter others from committing the same crime, and that defendant was a family member who held a position of trust or supervision when he committed the crimes. The State further noted that defendant possessed more than 100 images of child pornography. The State asserted that defendant's prospects for rehabilitation were low, given his failure to acknowledge and accept responsibility in the present case. The State further noted that defendant's psychosexual risk assessment reflected high scores in irresponsibility, manipulativeness, and impulsivity.

¶ 90    The State noted that defendant's sentence for child pornography (count I) was statutorily required to run consecutive to the sentences for aggravated criminal sexual abuse (counts II and III). The State requested that "a permissive consecutive sentence of Counts II and III apply." The State argued that consecutive sentences were appropriate "given the nature and circumstances of the offenses, the history and character of the defendant, that being his continued abuse of the family member, and doing so while in a position of trust and this occurring in this generation and last and

34

also due to the need to protect the public." The State requested that the trial court impose a sentence of 30 years on count I and 5 years on both counts II and III, for a total of 40 years in prison to be served at 50%. The State requested that the court impose a sentence of 7 years for counts II and III if the court elected to run counts II and III concurrently.

¶ 91    The trial court then asked the State to repeat the factors for permissive consecutive sentences, and the State responded, "That would be the nature and circumstances of the offense, the history and character of the defendant and a need to protect the public."

¶ 92    Defense counsel then argued that various factors in mitigation applied. Defense counsel asserted that defendant's conduct neither caused nor threatened serious physical harm to another, that defendant did not contemplate that his conduct would cause or threaten serious physical harm to another, and that defendant had no prior history of delinquency or criminal activity for a substantial period of time before the commission of the crime. Defense counsel argued that the court should give no weight to Megan Howder's statements, given that she was not present to testify at the sentencing hearing and she ultimately recanted her statements to police. Defense counsel further argued that defendant's criminal conduct was the result of circumstances unlikely to recur, given that the psychosexual evaluation indicated that defendant had a very low chance of recidivism. Defense counsel also noted that several witnesses testified that defendant had cared for their children without issue.

¶ 93    Defense counsel argued that "it would be inappropriate for the Court, even if discretion is allowed here, to sentence [defendant] consecutively for Counts II and III." Defense counsel stated, "You've got the same victim, the same course of conduct, similar allegations. It checks all of the boxes of why we run sentences concurrent." Defense counsel argued that defendant should be

35

sentenced on the lower range of 10 years because he was "somebody who's lived overall a law-abiding life." Defendant elected not to make a statement in allocution.

¶ 94    The State then presented two victim impact statements, one from R.H. and one from R.H.'s mother, Jessica Howder. The State read Jessica Howder's victim impact statement into evidence over defense counsel's objection. The State elected not to read R.H.'s written victim impact statement and asked that the trial court review the statement prior to imposing its sentence.

¶ 95    Following a brief recess, the trial court stated that it considered the trial evidence, the history, character and attitude of defendant, the victim impact statements, the PSI report, and the sexual offender evaluation, along with the evidence and arguments presented at the hearing. Regarding the factors in aggravation, the court found that defendant's conduct caused serious harm, as demonstrated by the trial testimony and victim impact statements. The court did not consider the fact that defendant held a position of trust or supervision as a family member as an aggravating factor because that "was one of the issues in the offense that had to be proven" and would result in "a double enhancement for the same activity."

¶ 96    Regarding the factors in mitigation, the trial court noted that defendant's conduct did not cause serious physical harm. The court did not find it appropriate to apply the mitigating factor that defendant did not contemplate that his criminal conduct would cause or threaten serious physical harm. The court found that defendant led a law-abiding life for a substantial period of time before the commission of the present crime. As to whether defendant's criminal conduct was the result of circumstances unlikely to recur, the court found "that that is not appropriate and does not exist in this case."

¶ 97    In addressing the State's argument regarding consecutive sentences, the trial court found "that the factors cited, the nature and circumstances of the allegations and now proven charges, the

36

history and character of the defendant, Mr. Howder, and the need to protect the public, do weigh in favor of consecutive sentences for Counts II and III." The court sentenced defendant to 20 years for soliciting child pornography (count I), 5 years for aggravated criminal sexual abuse (count II), and 5 years for aggravated criminal sexual abuse (count III). The court ordered defendant's sentences to run consecutively. The court entered a written order to that effect on April 28, 2022.

¶ 98    Defendant filed a timely notice of appeal.

¶ 99                                    II. Analysis

¶ 100   On appeal, defendant argues that (1) the State failed to prove him guilty, beyond a reasonable doubt, of child pornography and one count of aggravated criminal sexual abuse (count III); (2) the trial court erred by admitting the victim's out-of-court statements without first conducting a pretrial reliability hearing or, alternatively, defense counsel was ineffective for failing to raise the issue; (3) the court committed several errors related to the presentation of other-crimes evidence; (4) the court erred by barring defense counsel from presenting evidence impeaching the victim or, alternatively, counsel was ineffective for introducing other-crimes evidence after he was barred from perfecting the related impeachment; and (5) his 20-year sentence for child pornography was excessive and the court erred by ordering his sentences for aggravated criminal sexual abuse to run consecutively. We address defendant's arguments in turn.

¶ 101                        A. Sufficiency of the Evidence

¶ 102   1. Child Pornography

¶ 103   Defendant first argues that the State failed to prove, beyond a reasonable doubt, that he committed the offense of child pornography. Specifically, defendant argues that the State failed to prove any of the photographs were lewd, where the State failed to present any photographs depicting R.H. and R.H.'s testimony lacked sufficient detail to establish any of the photographs

37

met the statutory definition of lewdness. The State argues that R.H.'s testimony was sufficient to prove defendant guilty of child pornography. We agree with the State.

¶ 104 To prove defendant guilty of soliciting child pornography, as charged in count I, the State was required to present evidence demonstrating that defendant solicited, used, persuaded, induced, enticed, or coerced a child who he knew or should have known to be under the age of 18 to appear in a photograph or videotape (720 ILCS 5/11-20.1(a)(4) (West 2018)) in "any pose, posture or setting involving the lewd exhibition of the unclothed or transparently clothed genitals, pubic area, buttocks, or, if such person is female, a fully or partially developed breast of the child." *Id.* § 11-20.1(a)(1)(vii).

¶ 105 In *People v. Lamborn*, 185 Ill. 2d 585, 594 (1999), our supreme court held that "[n]udity without lewdness is not child pornography." Our supreme court defined lewd as " ' "[o]bscene, lustful, indecent, lascivious, lecherous." ' " *Id.* at 591 (quoting *People v. Walcher*, 162 Ill. App. 3d 455, 460 (1987), quoting Black's Law Dictionary 817 (5th ed. 1981)). Our supreme court also provided the following six factors for courts to consider in determining whether a visual depiction of a child constitutes a lewd or lascivious exhibition of the genitals:

> "(1) whether the focal point of the visual depiction is on the child's genitals; (2) whether the setting of the visual depiction is sexually suggestive, *i.e.*, in a place or pose generally associated with sexual activity; (3) whether the child is depicted in an unnatural pose, or in inappropriate attire, considering the age of the child; (4) whether the child is fully or partially clothed, or nude; (5) whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity; and (6) whether the visual depiction is intended or designed to elicit a sexual response in the viewer." *Id.* at 592.

Our supreme court noted, however, that "[t]he visual depiction need not involve all of these factors to be considered lewd." *Id.* "Rather, the determination of whether the visual depiction is lewd will involve an analysis of the overall content of the depiction, taking into account the age of the minor." *Id.* at 592-93. "This determination must therefore be made on a case-by-case basis." *Id.* at 593.

¶ 106   In *People v. Wayman*, 379 Ill. App. 3d 1043, 1054-55 (2008), this court held that a defendant may be convicted of child pornography even when the State does not present photographic evidence to the trier of fact to review. This court reasoned that

> "the State should not be precluded from presenting evidence that the crime of child pornography has been committed if the photographs or other depictions are unavailable through no fault of the State; rather, whatever evidence is available to describe the photographs should be submitted to the trier of fact, who can then decide whether that evidence is sufficient for a conviction." *Id.*

This court further concluded that, in cases where a reviewing court reviews the trier of fact's findings based upon testimony descriptions of photographs rather than the photographs themselves, this court will employ the traditional standard of review in a sufficiency of the evidence case—whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* at 1056.

¶ 107   Here, as in *Wayman*, the State did not present photographs identified as depicting R.H. to prove defendant guilty of soliciting child pornography. Instead, the State introduced a photograph that depicted an unclothed vagina with no other identifying information. Defendant does not argue that the State's failure to procure a picture of R.H. was the State's fault. R.H. testified that she

39

viewed the photographs she had taken of herself on defendant's phone but later noticed that the photographs were gone. Sheftick testified that several images were deleted from defendant's phone in the days between R.H.'s initial outcry and the seizure of the phone. Thus, similar to *Wayman*, the State presented R.H.'s testimony describing the photographs she took of herself using defendant's phone. Because the photographs were unavailable due to no fault of the State, this court will employ the standard of review applied in *Wayman*—whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. With this in mind, we consider whether the evidence presented was sufficient to prove defendant guilty, beyond a reasonable doubt, of soliciting child pornography.

¶ 108    In our view, R.H.'s testimony was sufficient to demonstrate that at least one of the pictures R.H. described involved a lewd exhibition of her unclothed genitals. With regard to the first *Lamborn* factor—whether the focal point of the visual depiction is on the child's genitals—R.H.'s testimony demonstrated that, at defendant's direction, she squatted naked over a phone placed on the floor, she observed the camera displaying her naked genitals, and she leaned over to take a picture of her naked genitals. R.H. additionally testified that, at defendant's direction, she photographed her naked "private area," which she described as her genitals, and her breasts. R.H. further testified that defendant pointed his phone at her naked genitals while she had her legs up on his shoulders in bed and took either photographs or a video. A reasonable jury could have inferred from this testimony that the resulting photographs were close-up images of R.H.'s naked genitals. See *People v. Baker*, 2021 IL App (3d) 190618, ¶ 38 (finding the first *Lamborn* factor satisfied where the child's vaginal area was the focal point of the image due to the child's position and the camera angle). Thus, we conclude that the first *Lamborn* factor was satisfied.

40

¶ 109   As to the second *Lamborn* factor—whether the setting of the visual depiction is sexually suggestive—R.H.'s testimony demonstrated that she took at least one close-up photograph of her naked vagina in the bathroom, while the other photographs were taken in either her bedroom or her mother's bedroom. While bathrooms generally are not sexually suggestive locations (*Wayman*, 379 Ill. App. 3d at 1057), the second factor may also be satisfied when an image depicts a pose associated with sexual activity. *Lamborn*, 185 Ill. 2d at 592. R.H.'s testimony demonstrated that the photograph she took in the bathroom was an extreme close-up of her naked vagina. R.H. testified that she squatted over the phone when taking the photograph, indicating that the photograph involved a pose generally associated with sexual activity. See *People v. Rodriguez-Ocampo*, 2021 IL App (2d) 190029-U, ¶ 14 (finding an extreme close-up of a child's vaginal opening taken by a camera placed directly below the child's vagina satisfied the second *Lamborn* factor). Moreover, the photographs R.H. described taking on her bed or her mother's bed could have satisfied the second *Lamborn* factor.

¶ 110   Regarding the third *Lamborn* factor—whether the child is depicted in an unnatural pose, or in inappropriate attire, considering the age of the child—R.H. testified that she took at least one photograph of her naked vagina squatting over a phone and that defendant took a photograph of her naked vagina while she was lying on her back in bed with her legs up on defendant's shoulders. R.H. also described additional photographs which depicted her unclothed genitals as the focal point. In our view, this evidence was sufficient to satisfy the third *Lamborn* factor.

¶ 111   Regarding the fourth *Lamborn* factor—whether the child is fully or partially clothed, or nude—R.H. testified that each photograph depicted her unclothed vagina or breasts. We conclude, and defendant concedes, that the fourth *Lamborn* factor was met.

41

¶ 112 Regarding the fifth *Lamborn* factor—whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity—R.H. testified that the photographs depicted close-ups of her naked vagina either squatting over a phone and or lying in bed with her legs on defendant's shoulders. As the State correctly notes, such images could be viewed as demonstrating a willingness to engage in sexual activity. In our view, this evidence was sufficient to satisfy the fifth *Lamborn* factor.

¶ 113 Regarding the sixth *Lamborn* factor—whether the visual depiction is intended or designed to elicit a sexual response in the viewer—R.H.'s testimony demonstrated that the photographs depicted positions that invited sexual activity with the viewer. Specifically, R.H. testified that one photograph depicted her naked vagina in a squatting position while another depicted her naked vagina while her legs were positioned above defendant's shoulders. We agree with the State that the images R.H. described could be viewed as inviting the viewer to see the images from a sexualized or deviant point of view, in that they appeared to invite a sexual response with the viewer. In our view, this evidence was sufficient to establish the sixth *Lamborn* factor.

¶ 114 Viewing R.H.'s testimony in a light most favorable to the State, we conclude that the images R.H. described satisfied most, if not all, of the *Lamborn* factors. Accordingly, we conclude that a reasonable jury could have found the evidence sufficient to prove defendant guilty of child pornography.

¶ 115 2. Aggravated Criminal Sexual Abuse

¶ 116 Defendant next argues that the State failed to prove, beyond a reasonable doubt, that he committed the offense of aggravated criminal sexual abuse, as charged in count III. Specifically, he argues that the State failed to prove his penis touched R.H.'s vagina through clothing, where R.H. testified that that defendant's penis did not touch her vagina and the only evidence supporting

the charge came from R.H.'s CAC interview, which was admitted into evidence without the required reliability hearing. The State argues that the evidence was sufficient to prove defendant guilty of aggravated criminal sexual abuse. We agree with the State.

¶ 117   To prove defendant guilty of aggravated criminal sexual abuse, the State was required to present evidence demonstrating that defendant committed an act of sexual conduct with a victim who was under 18 years of age and a family member of defendant. 720 ILCS 5/11-1.60(b) (West 2018). "Sexual conduct" is defined as "any knowing touching or fondling by the victim or the accused, either directly or through clothing, of the sex organs, anus, or breast of the victim or accused ***." *Id.* § 11-0.1.

¶ 118   As noted, when reviewing a challenge to the sufficiency of the evidence, the question is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); see also *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004) (adopting the *Jackson* formulation of the standard of review in challenges to the sufficiency of the evidence). "This standard of review 'gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.' " *People v. McLaurin*, 2020 IL 124563, ¶ 22 (quoting *Jackson*, 443 U.S. at 319). "In reviewing the evidence, this court will not retry the defendant, nor will we substitute our judgment for that of the trier of fact." *Id.* (citing *People v. Evans*, 209 Ill. 2d 194, 209 (2004)).

¶ 119   In applying this deferential standard of review, we cannot say that the State's evidence was insufficient to prove defendant guilty, beyond a reasonable doubt, of aggravated criminal sexual abuse, as alleged in count III. R.H. stated in her CAC interview that defendant "just lays down on

43

me to where his wiener touches my vagina." While defendant argues that the CAC interview should not have been admitted into evidence at trial, we conclude that defendant invited the admission of the CAC interview and failed to show that defense counsel was ineffective for failing to object to the admission of the CAC interview based on the trial court's failure to hold a reliability hearing, as will be fully discussed below. Accordingly, when viewing the evidence in a light most favorable to the State, we conclude that there was sufficient evidence to support defendant's conviction for aggravated criminal sexual abuse as alleged in count III.

¶ 120    Defendant notes, however, that R.H. testified at trial that defendant's penis did not touch her vagina. Defendant argues that R.H.'s testimony was inconsistent with the statement she made in her CAC interview, rendering the statement she made in her CAC interview unreliable.

¶ 121    As the State correctly notes, a recanted prior inconsistent statement alone can support a conviction, even without corroboration. *People v. Cox*, 377 Ill. App. 3d 690, 700 (2007). It is for the jury to weigh the statement and the disavowal and determine which is to be believed. *Id.* As the State noted during closing arguments, the jury could consider the fact that R.H. may have been nervous while testifying in front of a large number of people, including defendant, at trial. Woodham also testified that children may recant or change their statements for a number of reasons, including pressure from family. We also agree with the State that defense counsel may have confused R.H. by asking compound questions regarding her prior statement on cross-examination. Notably, defense counsel posed the following questions and statements to R.H. on cross-examination: "[The State] asked you if [defendant] ever touched your vagina with his—or touched his penis to your vagina while you guys both had clothes on, and you said no, he never did that. Do you remember that? That was just here a little while ago?" R.H. responded, "Yes." R.H. then did not recall if she provided a different statement during her CAC interview. Counsel

44

then posed the following questions to R.H.: "But you're saying today that that never happened? He never touched his penis to your vagina with clothes on? It was just touching with his hand? Is that what you're saying?" R.H. responded, "Yes." Given the multiple questions posed to R.H., any recantation could have resulted from defense counsel's confusing compound questions. For these reasons, the jury could have placed greater weight on the statement R.H. made in her CAC interview.

¶ 122    Moreover, we agree with the State that it presented sufficient evidence to prove defendant guilty of count III without the statement R.H. made in the CAC interview. Specifically, we agree with the State that the particular type of sexual conduct alleged was surplusage, not an essential element of the crime. In other words, the State was not required to specifically prove that defendant's penis touched R.H.'s vagina through clothing. See *People v. Priola*, 203 Ill. App. 3d 401, 405, 409-11 (1990) (affirming a defendant's conviction of aggravated criminal sexual abuse where the charging instrument's allegation that the defendant touched the victim's vaginal area was disregarded as surplusage). As the State notes, a variance between the facts alleged in the charging instrument and the proof at trial is not fatal where the facts are not essential elements of the charge. *Id.* at 410-11. We conclude that the State's allegation that defendant committed an act of "sexual conduct" was sufficient, and that the evidence that he committed any act of "sexual conduct" was sufficient. See *id.* at 411; see also *People v. Harper*, 251 Ill. App. 3d 801, 802-03, 807 (1993) (concluding that the jury could convict a defendant of aggravated sexual abuse based on evidence of a form of penetration different than that alleged in the charging instrument). This conclusion is supported by the jury instructions in this case, which provided that "[t]o sustain the charge of aggravated criminal sexual abuse as charged in Count III, the State must prove the following propositions": (1) that defendant committed an act of sexual conduct with R.H., (2) that

R.H. was under the age of 18 when the act was committed, and (3) that defendant was a family member. The jury instructions also defined the term "sexual conduct" as "any intentional or knowing touching or fondling by the accused, either directly or through the clothing, of the sex organ, anus, or breast of the victim, for the purpose of sexual gratification or arousal of the victim or the accused." Thus, the jury instructions did not require the jury to specifically find that defendant's penis touched R.H.'s vagina through clothing.

¶ 123   Here, R.H. testified regarding multiple instances where defendant used his hand to touch her vaginal area, including instances in her front room, her mother's bedroom, her own bedroom, defendant's car, and defendant's house. As the State correctly notes, each of these instances would support a separate count of aggravated criminal sexual abuse. See 720 ILCS 5/11-1.60(b), 11-0.1 (West 2018); *People v. King*, 66 Ill. 2d 551, 566 (1977). For this additional reason, we conclude that there was sufficient evidence to sustain defendant's conviction for aggravated criminal sexual abuse.

¶ 124                    B. Failure to Hold Reliability Hearing

¶ 125   Defendant next argues that the trial court erred by admitting R.H.'s out-of-court statements without holding a reliability hearing. Specifically, defendant argues that the court erred by admitting the recording of R.H.'s CAC interview and Megan Howder's testimony regarding the out-of-court statements R.H. made to her. The State seemingly concedes that the court erred by failing to hold a reliability hearing but argues that any error was invited error. We agree with the State.

¶ 126   As an initial matter, defendant acknowledges that defense counsel failed to object to the admission of R.H.'s out-of-court statements on the basis that the trial court failed to hold the required reliability hearing. Thus, defendant concedes that he failed to preserve this issue for

46

review on appeal. However, defendant asks this court to consider the issue under the plain-error doctrine. "The plain error doctrine can be used in criminal cases to review unpreserved error in two situations: 'if either [(1)] the evidence was closely balanced or [(2)] the error was of such magnitude that the defendant was denied a fair trial.' " *People v. Reber*, 2019 IL App (5th) 150439, ¶ 81 (quoting *People v. Hindson*, 301 Ill. App. 3d 466, 473-74 (1998)). "The defendant bears the burden of persuasion in plain error review." *Id.* (citing *People v. Thompson*, 238 Ill. 2d 598, 613 (2010)). We note that, here, defendant agues only that the evidence was closely balanced and, thus, seeks review only under the first prong of the plain-error doctrine.

¶ 127   Alternatively, defendant argues that defense counsel was ineffective for failing to argue that the CAC interview included statements that were inadmissible under section 115-10. "In order to succeed on a claim of ineffective assistance of counsel, a defendant must show (1) counsel's representation fell below an objective standard of reasonableness (deficiency prong) and (2) there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different (prejudice prong)." *People v. Boyd*, 2018 IL App (5th) 140556, ¶ 16 (citing *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984)).

¶ 128   We first consider whether the trial court erred by admitting the out-of-court statements without holding a reliability hearing. Under section 115-10, a hearsay statement made by a child declarant may only be admitted if the trial court first finds "in a hearing conducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient safeguards of reliability." 725 ILCS 5/115-10(b)(1) (West 2018). Our supreme court has noted:

> "By means of section 115-10 the legislature has provided for the admission into evidence
>
> of out-of-court statements of children alleged to have been victims of sexual abuse.
>
> [Citation.] Of necessity, however, the legislature has incorporated within section 115-10 a

47

measure to protect against the admission of unreliable evidence, namely, the requirement of a finding by the court in a hearing conducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient safeguards of reliability. It is error in a jury trial to admit into evidence, pursuant to section 115-10, testimony about a child's out-of-court statement without such a hearing." *People v. Mitchell*, 155 Ill. 2d 344, 351-52 (1993).

¶ 129    Here, it is undisputed the trial court admitted the out-of-court statements into evidence at trial without holding a reliability hearing, as required by the plain language of section 115-10. By failing to hold the statutorily required hearing, we agree with defendant that the court clearly and obviously erred.

¶ 130    We acknowledge that, in *Mitchell*, our supreme court concluded that where the trial court improperly admitted out-of-court statements into evidence without holding a reliability hearing and where the minor victim's trial testimony had "serious contradictions," the evidence was "sufficiently close that the failure to instruct the jury as required by section 115-10(c) constitute[d] plain error." *Id.* at 354. While the present case is similar to *Mitchell* in that the trial court failed to hold the required reliability hearing, we note that, in *Mitchell*, our supreme court concluded that plain error occurred based, in part, on the trial court's failure "to instruct the jury as required by section 115-10(c) (Ill. Rev. Stat. 1989, ch. 38, par. 115-10(c))." *Id.* at 353. Unlike *Mitchell*, here, the trial court did instruct the jury as required by section 115-10(c), which provides as follows:

"If a statement is admitted pursuant to this Section, the court shall instruct the jury that it is for the jury to determine the weight and credibility to be given the statement and that, in making the determination, it shall consider the age and maturity of the child, or the intellectual capabilities of the person with an intellectual disability, a cognitive impairment,

48

or developmental disability, the nature of the statement, the circumstances under which the statement was made, and any other relevant factor." 725 ILCS 5/115-10(c) (West 2018).

¶ 131 Specifically, in this case, the trial court instructed the jury as follows:

"You have before you evidence that [R.H.] made statements concerning the offenses charged in this case. It is for you to determine whether the statements were made, and, if so, what weight should be given to the statements. In making that determination, you should consider the age and maturity of [R.H.], the nature of the statements, and the circumstances under which the statements were made."

¶ 132 Thus, we find the present case distinguishable from *Mitchell*, where the jury received the proper instruction. We acknowledge, however, that this court has previously concluded that "merely instructing the jury, without holding the hearing, does not correct the error." *People v. Olson*, 2018 IL App (5th) 150176-U, ¶ 52. Despite this, we agree with the State that, under the circumstances of the present case, the trial court's failure to hold the required reliability hearing either constituted invited error as it related to the CAC interview and did not amount to plain error as to Megan Howder's testimony.

¶ 133 1. CAC Interview

¶ 134 We first agree with the State that the admission of the CAC interview constituted invited error under the circumstances of the present case. Under the invited error rule, "a party cannot complain of error that it brought about or participated in." *People v. Hughes*, 2015 IL 117242, ¶ 33. Invitation or agreement to the procedure challenged on appeal goes beyond mere waiver and is sometimes referred to as one of estoppel. *People v. Harvey*, 211 Ill. 2d 368, 385 (2004). The rule precludes a defendant from requesting to proceed in one manner and then contending on appeal that the course of action constituted error. *Id.* "To permit a defendant to use the exact ruling

49

or action procured in the trial court as a vehicle for reversal on appeal 'would offend all notions of fair play' [citation], and 'encourage defendants to become duplicitous' [citation]." *Id.* "Illinois courts have applied the invited error doctrine in numerous cases to bar a defendant from claiming error in the admission of improper evidence where the admission was procured or invited by the defendant." *Id.* at 386.

¶ 135  In the present case, defense counsel twice affirmatively and explicitly stated that he had no objection to the admission of the edited video of R.H.'s CAC interview. Prior to jury selection, the parties addressed the State's request to introduce an edited version of the CAC interview. In doing so, defense counsel stated, "I don't have any objection to doing that ***." Counsel also stated, "I don't object to the State introducing an edited version of the interview to the jury ***." Defense counsel also stated that he did not care how much of the video was published to the jury, as long as the edits did not limit his cross-examination of Woodham. On direct examination, Woodham testified that she reviewed the unedited and edited recordings of the CAC interview. When the State asked Woodham if the edited recording excluded irrelevant material, defense counsel objected based on lack of foundation and argued that some of the redacted material was relevant. In other words, counsel's position was that more of the CAC interview should be published to the jury.

¶ 136  It also appears from the record that defense counsel intended to utilize several statements R.H. made in the CAC interview to discredit her trial testimony. Notably, counsel attempted to show that the CAC interview demonstrated that R.H. was coached and changed her story. Accordingly, it appears that counsel made a tactical decision to utilize the CAC interview at trial, demonstrating that counsel made a conscious decision to forego the reliability hearing in this case.

50

¶ 137   Thus, while defense counsel was presumably aware that the circuit court had not held a reliability hearing, counsel did not object on the basis that the trial court failed to hold a reliability hearing or on the basis that the statements made in the video were unreliable. Counsel, instead, attempted to utilize the CAC interview to challenge R.H.'s credibility. Under these circumstances, we agree with the State that any error in the admission of the video was invited error. See *People v. Rottau*, 2017 IL App (5th) 150046, ¶¶ 64-65 (holding that defendant could not argue on appeal that the trial court committed plain error by failing to hold a section 115-10 hearing where the defendant acquiesced to the procedure); see also *People v. Johnson*, 2023 IL App (4th) 220201, ¶ 34 (defendant's stipulation that the statement met the statutory requirements in lieu of a hearing under section 115-10 constituted invited error). Because any error in the admission was invited error, defendant cannot argue on appeal that the court committed plain error by admitting the CAC interview without holding a reliability hearing. See *Rottau*, 2017 IL App (5th) 150046, ¶ 65.

¶ 138   Alternatively, defendant argues that defense counsel was ineffective for failing to argue that the CAC interview included statements that were inadmissible under section 115-10. We note that, unlike plain error, "[c]laims of ineffective assistance of counsel are not precluded by the invited error doctrine." *People v. Drew*, 2024 IL App (5th) 240697, ¶ 31. "In order to succeed on a claim of ineffective assistance of counsel, a defendant must show (1) counsel's representation fell below an objective standard of reasonableness (deficiency prong) and (2) there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different (prejudice prong)." *Boyd*, 2018 IL App (5th) 140556, ¶ 16 (citing *Strickland*, 466 U.S. at 687-88). "To establish deficiency under the first prong of the *Strickland* test, an individual must overcome the strong presumption that the challenged action or inaction was the product of sound trial strategy." *Id.* ¶ 17 (citing *People v. Simms*, 192 Ill. 2d 348, 361 (2000)). "It is well settled there is

51

a strong presumption that counsel's conduct falls within the wide range of professional assistance." *Id.* (citing *People v. Crutchfield*, 2015 IL App (5th) 120371, ¶ 34). To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

¶ 139   "Both prongs under *Strickland* must be satisfied in order to succeed on a claim of ineffective assistance, and the failure to satisfy either prong will be fatal to the claim." *Boyd*, 2018 IL App (5th) 140556, ¶ 19 (citing *People v. Mack*, 2016 IL App (5th) 130294, ¶ 27). "Therefore, a court need not address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* (citing *People v. Ramos*, 339 Ill. App. 3d 891, 900 (2003)).

¶ 140   Here, defendant is unable to show that defense counsel's performance was deficient. The record demonstrates that counsel's trial strategy was to utilize the content of the CAC interview to demonstrate that R.H.'s allegations were false. Specifically, defense counsel sought to use the statements R.H. made in her CAC interview to show that R.H. was coached by relatives who did not like defendant and that R.H. was lying. As the State correctly notes, defense counsel stated in his opening statement that Kimberly and Megan Howder talked to R.H. "about what she was going to say before she said it" and that the jury would "hear changes in [her] story as it keeps going down the line." Counsel advised the jury that it would hear "portions" of a recorded statement she made in 2017, and that they would "hear her say certain things very clearly, as if rehearsed." Counsel further advised the jury that R.H. was unable to provide details, which indicated that it was "not her story." In closing arguments, counsel reiterated the points he made in opening statements and added that Woodham asked leading questions "to see if she could get [R.H.] to say" that her clothes moved, or were off, or that defendant's clothes moved.

52

¶ 141 Accordingly, defense counsel used the challenged evidence in support of his argument that R.H. had been coached and was lying about the incidents with defendant. Counsel argued that R.H.'s testimony lacked credibility for this reason. We note, as does the State, that defendant argues on appeal that R.H.'s account of the events "evolved significantly" from her statement to Megan Howder, to her statement to Woodham, to her trial testimony. We conclude that counsel's use of the challenged evidence was a matter of trial strategy, and defendant has failed to show that counsel's strategic decision was unreasonable under the circumstances. See *People v. Perry*, 224 Ill. 2d 312, 355 (2007) (matters pertaining to trial strategy will usually not support a claim of ineffective assistance of counsel, even if counsel made a mistake in trial strategy or tactics or made an error in judgment).

¶ 142 Moreover, defendant is unable to show prejudice. As the State correctly notes, the CAC interview likely would have been admitted had the trial court held a reliability hearing under section 115-10. R.H. made statements to Woodham, a trained and experienced forensic interviewer. Woodham testified that she only asked open-ended, non-leading questions during the interview. Thus, in our view, the trial court would have found R.H.'s statements reliable and admitted the CAC interview into evidence. For this reason, defendant has failed to show that there was a reasonable probability that defense counsel could have procured a different result. See *Johnson*, 2023 IL App (4th) 220201, ¶¶ 39-46. Moreover, any prejudice was mitigated by the jury instruction requiring the jurors to assess whether R.H. made the statements, and if so, what weight should be given to her statements in light of her age and maturity, the nature of the statements, and the circumstances under which they were made.

¶ 143   2. Megan Howder's Testimony

¶ 144   We additionally conclude that the admission of Megan Howder's testimony regarding R.H.'s out-of-court statements did not constitute plain error and that defense counsel was not ineffective for failing to object to the admission of the testimony on the basis that the trial court failed to hold the required reliability hearing. We begin by noting that Megan's testimony demonstrated that R.H. advised her that defendant touched R.H.'s private areas, or her vaginal area over her clothing, and that R.H. advised her that defendant had asked R.H. to place his phone on the bathroom floor and photograph R.H.'s private area.

¶ 145   As noted, the plain-error doctrine allows this court to consider an unpreserved error if the evidence was closely balanced or the error was so great that the defendant did not receive a fair trial. *Reber*, 2019 IL App (5th) 150439, ¶ 81. We reiterate that "[t]he defendant bears the burden of persuasion in plain error review." *Id.* Where, as here, the defendant argues that the evidence is closely balanced, it is the defendant's burden to establish that the evidence was closely balanced. *People v. Piatkowski*, 225 Ill. 2d 551, 566 (2007).

¶ 146   A reviewing court must determine if the evidence was so closely balanced that the error "severely threatened to tip the scales of justice." *People v. Sebby*, 2017 IL 119445, ¶ 51 (citing *People v. Herron*, 215 Ill. 2d 167, 187 (2005)). The reviewing court must consider and evaluate the totality of the evidence presented "and conduct a qualitative, commonsense assessment of it within the context of the case." *Id.* ¶ 53 (citing *People v. Belknap*, 2014 IL 117094, ¶¶ 52-53). In doing so, the reviewing court must evaluate all evidence on the elements of the charged offense, along with all evidence pertaining to witness credibility. *Id.*

¶ 147   Here, Megan Howder testified that on September 8, 2017, R.H. advised her that defendant touched R.H.'s private areas. R.H. clarified that defendant touched her vaginal area over her

clothing. R.H. also advised Megan that defendant had asked R.H. to place his phone on the bathroom floor and photograph R.H.'s private area. Again, defense counsel did not object to Megan's testimony based on the trial court's failure to hold a reliability hearing. Counsel, instead, objected on the basis that Megan's testimony was more prejudicial than probative. Counsel went on to elicit additional testimony from Megan that R.H. stated the touching and taking of photographs occurred on "several" occasions. Megan's testimony merely corroborated R.H.'s testimony and the statements R.H. made in her CAC interview, both of which were properly admitted into evidence at trial. Because Megan Howder's testimony regarding R.H.'s out-of-court statements was cumulative, defendant would have been convicted even if such testimony had not been admitted into evidence at trial.

¶ 148    Accordingly, we conclude that defendant has failed to show the evidence was closely balanced or that he was prejudiced by defense counsel's failure to object to Megan's testimony regarding R.H.'s out-of-court statements. *People v. White*, 2011 IL 109689 (plain-error review under the closely-balanced-evidence prong of plain error is similar to an analysis for ineffective assistance of counsel based on evidentiary error insofar as a defendant in either case must show he was prejudiced).

¶ 149    In sum, we conclude that defendant invited the admission of the CAC interview and, thus, he cannot argue plain error regarding the admission of the CAC interview. We further conclude that defendant has failed to show that defense counsel's performance regarding the CAC interview resulted in prejudice. We also conclude that the admission of Megan Howder's testimony did not constitute plain error and that defense counsel was not ineffective for failing to object to the admission of her testimony on the basis of the court's failure to hold a reliability hearing. Thus,

we hold that the trial court's failure to hold a reliability hearing under section 115-10 did not constitute reversible error under the circumstances of the present case.

¶ 150                                C. Other-Crimes Evidence

¶ 151   Defendant next argues that the trial court erred by admitting into evidence at trial Exhibits 4, 5, and 6, as well as R.H.'s testimony regarding defendant photographing her. Defendant asserts that the State impermissibly turned its case into a mini-trial on other-crimes evidence, where neither the three photographic exhibits nor the detailed testimony about defendant photographing R.H. were relevant to the charged conduct. The State argues that defendant forfeited review of this issue, and that he has failed to establish plain error or ineffective assistance of counsel. We agree with the State.

¶ 152   As the State correctly notes, defendant forfeited review of these issues on appeal because he failed to raise the issues in a posttrial motion. Defendant acknowledges his forfeiture but asks this court to consider the issue under the plain-error doctrine. As noted, "[t]he plain error doctrine can be used in criminal cases to review unpreserved error in two situations: 'if either [(1)] the evidence was closely balanced or [(2)] the error was of such magnitude that the defendant was denied a fair trial.' " *Reber*, 2019 IL App (5th) 150439, ¶ 81 (quoting *Hindson*, 301 Ill. App. 3d at 473-74). "The defendant bears the burden of persuasion in plain error review." *Id.* (citing *Thompson*, 238 Ill. 2d at 613). Defendant, here, maintains that the evidence was closely balanced and, thus, seeks review under the first prong of the plain-error doctrine.

¶ 153   Defendant alternatively asks this court to consider the issue where trial counsel provided ineffective assistance by failing to raise the issue in a posttrial motion. "To prevail on an ineffective-assistance-of-counsel claim, defendant must show that his attorney's representation was objectively unreasonable and that he was prejudiced by that representation." *Id.* ¶ 82 (citing

*Strickland*, 466 U.S. at 687). "This standard requires a finding that it is reasonably probable that the defendant would not have been convicted if his attorney had not committed error." *Id.* (citing *Strickland*, 466 U.S. at 687). With these principles in mind, we consider defendant's specific arguments on appeal.

¶ 154   1. Exhibit 4

¶ 155   Defendant first argues that the State converted Exhibit 4—the close-up photograph of a female's unclothed vagina—into prejudicial other-crimes evidence and misled the jurors into believing they could convict him based on their perception of the lewdness of an uncharged photograph. The State argues that the circuit court did not plainly err by admitting Exhibit 4 into evidence at trial. We agree with the State.

¶ 156   "Generally, evidence is relevant and admissible if it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' " *People v. Epstein*, 2022 IL 127824, ¶ 20 (quoting Ill. R. Evid. 401 (eff. Jan. 1, 2011)). " 'Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.' " *Id.* (quoting Ill. R. Evid. 403 (eff. Jan. 1, 2011)). It is the function of a jury " 'to assess the credibility of witnesses, weigh the evidence presented, resolve conflicts in the evidence, and draw reasonable inferences from the evidence.' " *People v. Ward*, 2011 IL 108690, ¶ 34 (quoting *People v. Moss*, 205 Ill. 2d 139, 164 (2001)). To perform this function properly, "the jury must be given as much relevant, admissible evidence as possible." *Epstein*, 2022 IL 127824, ¶ 21 (citing *Ward*, 2011 IL 108690, ¶ 34).

¶ 157 "The trial court's decision on whether to admit evidence is reviewed for abuse of discretion." *Id.* ¶ 20 (citing *People v. King*, 2020 IL 123926, ¶ 35). "An abuse of discretion occurs only where the trial court's decision is 'arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it.' " *King*, 2020 IL 123926, ¶ 35 (quoting *People v. Rivera*, 2013 IL 112467, ¶ 37).

¶ 158 Here, we cannot say that the trial court abused its discretion by admitting Exhibit 4 into evidence at trial. As the State correctly notes, Exhibit 4 was circumstantial evidence that corroborated R.H.'s testimony that defendant directed her to use his phone to photograph herself naked in a squatting position. The photograph was relevant to count I in that it tended to prove that defendant solicited R.H. to appear in a lewd photograph. We also agree with the State that defendant's claims that the photograph could have been taken from the internet and not depicted R.H. went to the weight of the evidence, not its admissibility. See *People v. Watts*, 2022 IL App (4th) 210590, ¶¶ 2, 70, 74-83 (the appellate court found that the trial court did not abuse its discretion by admitting memes from the defendant's phone regardless of the authorship of the memes).

¶ 159 At trial, the State repeatedly stated that it could not prove Exhibit 4 depicted R.H. Notably, the State stated that it was "not trying to authenticate [the photograph] in the sense of we are saying this is [R.H.]. We are authenticating this as an image of child pornography that is visually similar to the testimony she describes in creating child pornography at the defendant's request." During closing, the State stated that "[t]he photo shown to [the jury], Exhibit 4, the naked vagina of a prepubescent girl cannot be definitively identified as [R.H.]." The purpose for the admission of Exhibit 4 was not to prove that R.H. was depicted in the photograph but to show that the photograph was found on defendant's phone. Defendant remained free to challenge the reliability

of the photograph, minimize its importance, or argue alternative interpretations of the photograph's meaning, as defense counsel did in this case. Notably, counsel highlighted to the jury the fact that the State could not prove Exhibit 4 depicted R.H. and claimed that Exhibit 4 did not depict R.H.

¶ 160   We also agree with the State that the present case is distinguishable from *People v. Wade*, 51 Ill. App. 3d 721 (1977). In *Wade*, this court held that it was error to admit evidence that a gun was found on the defendant's person during his arrest, where the State stipulated that the gun found was not the murder weapon. *Id.* at 729-30. Unlike *Wade*, here, the State never stipulated or admitted that the photograph did not depict R.H. Instead, the State's position was that the photograph may or may not depict R.H. Thus, we find defendant's reliance on *Wade* misplaced.

¶ 161   We further agree with the State that an other-crimes analysis was not required because the photograph was not necessarily evidence of another crime, given that R.H. could have taken the photograph of herself at defendant's request. In other words, it could have been the photograph that formed the basis for count I. The State clearly and consistently advised the jury that Exhibit 4 could not be "definitively identified" as R.H. but claimed it was consistent with the photograph she described taking of herself. This allowed the jury to consider all relevant evidence and perform its function of weighing the evidence and drawing all reasonable inferences therefrom.

¶ 162   For these reasons, we agree with the State that the trial court did not abuse its discretion by admitting Exhibit 4 into evidence at trial without conducting an other-crimes analysis. In doing so, we note that it is unclear from the record whether the court conducted the required balancing test prior to admitting Exhibit 4 into evidence; however, we note that defendant has not provided sufficient argument on this specific issue in his brief to this court. Accordingly, defendant forfeited review of this issue on appeal.

59

¶ 163    Moreover, we agree with the State that defendant has failed to show plain error, where the evidence against defendant in count I was not closely balanced. As we have previously concluded, R.H.'s testimony, standing alone, supported defendant's conviction on count I. Specifically, R.H. testified that defendant directed her to squat over his phone and take a photograph of her unclothed vagina. R.H. testified that defendant directed her to photograph herself on multiple occasions. R.H.'s testimony was supported by her CAC interview, in which she provided consistent statements to Woodham regarding the photographs she took of herself at defendant's direction. R.H. testified that she observed the photographs on defendant's phone but later noticed that the photographs were not on defendant's phone. Sheftick testified that defendant deleted files from his cell phone in the days prior to the search of his phone. While defendant testified that he did not solicit photographs from R.H., defendant's testimony was self-serving and conflicted with other evidence presented at trial. Notably, defendant acknowledged that the photographs were found on his phone but claimed he had never seen them. Defendant also claimed that he never had his "old" phone around the children but later admitted that he may have had the phone around the children. Defendant's testimony conflicted with R.H.'s testimony that defendant had a new phone, which was used for phone calls, and an old phone, which was not used for typical phone activity. Sheftick's testimony corroborated R.H.'s testimony in this regard. R.H.'s testimony demonstrated that she was familiar with both of defendant's phones despite his testimony that he did not have his older phone around his grandchildren. Thus, we agree with the State that defendant's testimony did not render the evidence closely balanced.

¶ 164    Considering R.H.'s testimony, coupled with the fact that the State emphasized to the jury during opening and closing arguments that it could not prove the photograph in Exhibit 4 depicted R.H., we cannot say that the outcome of defendant's trial would have been different had the court

60

excluded Exhibit 4. Thus, we hold that any error the court committed in admitting Exhibit 4 into evidence did not rise to the level of plain error. For this reason, defendant's claim of ineffective assistance also fails. See *White*, 2011 IL 109689 (plain-error review under the closely-balanced-evidence prong of plain error is similar to an analysis for ineffective assistance of counsel based on evidentiary error insofar as a defendant in either case must show he was prejudiced).

¶ 165   2. Exhibits 5 and 6

¶ 166   Defendant next argues that the State's failure to prove Exhibit 4 was a photograph of R.H. destroyed the relevance of Exhibits 5 and 6. The State responds that the trial court did not plainly err by admitting Exhibits 5 and 6. We agree with the State.

¶ 167   Generally, evidence of other acts or crimes is not admissible to prove a defendant has a propensity to commit a crime. *Reber*, 2019 IL App (5th) 150439, ¶ 74. Despite this, "certain sexually-based acts and/or crimes may be admissible to establish a defendant's intent or propensity to commit a similar crime." *Id.* ¶ 75. "Section 115-7.3 of the Code of Criminal Procedure of 1963 authorizes the introduction of other acts and/or crimes evidence in specific cases and provides specific guidance for admissibility." *Id.* (citing 725 ILCS 5/115-7.3 (West 2014)). Child pornography and criminal sexual abuse of a child are listed in section 115-7.3 as the types of crimes where other acts or crimes evidence could be admissible. 725 ILCS 5/115-7.3(a)(1) (West 2018). "If the defendant is accused of an offense *** [in this statute] ***, evidence of the defendant's commission of another offense or offenses *** [in this statute] *** may be admissible *** and may be considered for its bearing on any matter to which it is relevant." *Id.* § 115-7.3(b). "Proof of other acts and/or crimes evidence may be made 'by specific instances of conduct.' " *Reber*, 2019 IL App (5th) 150439, ¶ 76 (quoting 725 ILCS 5/115-7.3(e)). "The legislature elected to single

out sex offenders by allowing the introduction of evidence of other acts and/or crimes because sex offenders tend to repeat their crimes." *Id.* ¶ 75.

¶ 168   However, "[a]dmission of these specific other acts and/or crimes is not without limits." *Id.* ¶ 77. The trial court must weigh the probative value of the other acts or crimes evidence and determine that the probative value outweighs any undue prejudice to the defendant. *Id.* (citing 725 ILCS 115-7.3(c)). In making this determination, the court may consider "(1) the proximity in time to the charged or predicate offense; (2) the degree of factual similarity to the charged or predicate offense; or (3) other relevant facts and circumstances." 725 ILCS 115-7.3(c) (West 2018). This court reviews the trial court's decision to admit other acts or crimes evidence for an abuse of discretion. *Reber*, 2019 IL App (5th) 150439, ¶ 78 (citing *People v. Donoho*, 204 Ill. 2d 159, 182 (2003)).

¶ 169   Here, defendant fails to show that the trial court abused its discretion by admitting Exhibits 5 and 6—two of the images charged in the Edwards County case—into evidence at trial. The record clearly demonstrates that the court reviewed the photographs at issue, considered the appropriate factors, and determined that the probative value outweighed any prejudicial effect. After carefully reviewing the court's April 13, 2021, order, this court cannot conclude that the court's determination was arbitrary, fanciful, or unreasonable.

¶ 170   The trial court's April 13, 2021, order clearly indicates that the court considered the proximity in time to the charged or predicate offense. The court noted that the present case involved charges relating to defendant's solicitation of child pornography between July 15, 2015, and September 8, 2017, while the Edwards County case charged defendant with possession of child pornography on or about September 11, 2017. Accordingly, the court found the "Edwards County time range to be sufficiently proximate in time to the time range alleged in the instant

case." We acknowledge defendant's argument that the State was unable to show when defendant obtained the photographs on his phone; however, defendant acknowledges that he obtained the cell phone in 2014. As such, defendant obtained the photographs on his phone within three years of the charged conduct in this case. Our supreme court has stated that offenses which are close in time to the charged offenses have more probative value than those which are remote; however, the admissibility of other-crimes evidence cannot "be controlled solely by the number of years that have elapsed between the prior offense and the crime charged." *People v. Illgen*, 145 Ill. 2d 353, 370 (1991). We cannot say that the court abused its discretion by determining that the photographs were sufficiently proximate in time to the charged offense.

¶ 171    The trial court's April 13, 2021, order also clearly indicates that the court considered the degree of factual similarity to the charged or predicate offense. The court noted that Exhibits 5 and 6 were discovered on the same phone as Exhibit 4, which was relevant to the present case. While the court did compare the photographs to Exhibit 4, we note that Exhibit 4 depicted the same or similar circumstances of the photograph R.H. testified that she took of herself on defendant's phone. The court was never provided with the photograph contained in Exhibit 4 before it made its ruling on Exhibits 5 and 6. Instead, the court relied on the State's description of the photograph, which was consistent with the testimony R.H. provided at trial. The court considered that all of the photographs it ruled admissible depicted young females—a fact which remains true—in finding Exhibits 5 and 6 admissible. " 'Mere general areas of similarity will suffice' to support admissibility." *Donoho*, 204 Ill. 2d at 184 (quoting *Illgen*, 145 Ill. 2d at 373). We cannot say that the court abused its discretion by determining that the photographs were sufficiently similar to the charged offense.

63

¶ 172   In addition, the trial court determined that, although Exhibits 5 and 6 would be inherently prejudicial to defendant at trial, such evidence would be extremely probative in that such evidence would show defendant's intent and absence of mistake or accident in soliciting child pornography from R.H. The court additionally noted that the evidence would not become the focus of the trial or mislead or confuse the jury. The court, instead, concluded that the photographs would supplement evidence supporting the present case. To further protect against undue prejudice to defendant, the court limited the admission of the photographs to those depicting minor females. The court also precluded the State from eliciting testimony that defendant was criminally charged with possession of child pornography in Edwards County. We also note that the court further limited this evidence at trial when it ruled that Exhibit 7, which depicted a young female with a penis in her mouth, was inadmissible because its prejudicial value outweighed its probative value. Moreover, the court denied the State's request to admit 10 additional images of child pornography, Sheftick's testimony regarding the number of photographs found on defendant's phone, and the testimony of Megan Howder and Kristi Emmons that defendant committed similar acts against them. In our view, the court's limitation of the evidence demonstrates that the court carefully balanced the probative value of Exhibits 5 and 6 against undue prejudice to defendant.

¶ 173   For these reasons, we cannot say that the trial court abused its discretion by admitting Exhibits 5 and 6 into evidence at trial. Consequently, defendant failed to establish plain error or ineffective assistance of counsel.

¶ 174   3. R.H.'s Testimony

¶ 175   Defendant next argues that the State improperly elicited other-crimes evidence from R.H. concerning multiple instances where defendant photographed or videotaped her. The State responds that such evidence did not constitute other-crimes evidence. We agree with the State.

64

¶ 176   As the State correctly notes, count I alleged that defendant "solicited, used, persuaded, induced, enticed, or coerced" R.H. to appear in a photograph involving the lewd exhibition of her unclothed genitals. The State points out that the photographer's identity is not specified in count I, the statute under which defendant was charged, or in the jury instructions. We agree with the State that if a defendant solicits a child to appear in a lewd photograph, the plain language of the statute is satisfied regardless of whether the photographer is identified as the defendant or the minor victim. See 720 ILCS 5/11-20.1(a)(4); see also *People v. Hollins*, 2012 IL 112754, ¶¶ 1, 3, 6-7, 9 (our supreme court affirmed child pornography convictions, including solicitation of child pornography, where the defendant photographed the minor while sexually penetrating the minor).

¶ 177   Here, the evidence established that R.H. photographed herself at defendant's request and that defendant photographed her. This evidence was probative as to count I, as it all tended to prove that defendant solicited R.H. to appear in lewd photographs. R.H.'s testimony regarding the incident where defendant had her legs on his shoulders did not clearly indicate if defendant took photographs or videos, making it probative as to count I. Although R.H. advised Woodham that defendant video recorded her after she took a shower, R.H. never stated that she was naked or displaying her genitals. Accordingly, this statement was not evidence of another crime of child pornography.

¶ 178   In addition, based on our above determination that the evidence was not closely balanced, we agree with the State that defendant has failed to establish first-prong plain error and ineffective assistance of counsel. See *White*, 2011 IL 109689.

¶ 179                          D. A.H.'s Denial

¶ 180   Defendant argues that the trial court erred by rejecting his attempt to impeach R.H.'s credibility on the issue of whether he sexually abused A.H. Defendant acknowledges that he

forfeited review of this issue but claims that this court should review the issue under the plain-error doctrine or, alternatively, as a claim of ineffective assistance of counsel. The State argues that the court did not plainly abuse its discretion by barring evidence impeaching R.H. on a collateral matter, and that counsel was not ineffective. We agree with the State.

¶ 181   As an initial matter, we note that the record on appeal does not contain the recording of A.H.'s CAC interview. The State characterized the statements made by A.H. during the CAC interview as not disclosing the uncharged allegations, while the defense characterized the statements as specifically refuting them, not corroborating them, or denying them. As the State correctly notes, any doubts arising from the absence of A.H.'s CAC interview will be construed against defendant. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984). With this in mind, we consider whether the court erred by barring evidence impeaching R.H.

¶ 182   A witness may not be impeached on a collateral matter, and extrinsic evidence may not be introduced for that purpose. *People v. Terrell*, 185 Ill. 2d 467, 509 (1998); *People v. Jackson*, 2018 IL App (5th) 150274, ¶ 64. A matter is considered collateral if it is irrelevant to a material issue; the test is whether it could not be introduced for any purpose other than to contradict a witness. *People v. Santos*, 211 Ill. 2d 395, 405 (2004). It is within the province of the trial court to determine whether a matter is collateral, and this court will not reverse the trial court's determination unless there is a clear abuse of discretion resulting in manifest prejudice. *Jackson*, 2018 IL App (5th) 150274, ¶ 65.

¶ 183   Here, the trial court did not abuse its discretion by refusing to allow defense counsel to introduce evidence that A.H. did not disclose abuse to Woodham during her CAC interview. Specifically, defense counsel sought to discredit R.H. by showing that R.H.'s testimony that she observed defendant sexually abusing A.H. directly conflicted with the statements A.H. made

66

during her CAC interview. Defense counsel sought to introduce this evidence to demonstrate that R.H. lacked credibility. Because defendant was not charged with sexually abusing A.H., we agree with the State that the matter was collateral. For these reasons, and because the record does not contain A.H.'s CAC interview or the substance of the testimonies of A.H. or Woodham regarding the interview, we conclude that the trial court acted within its discretion when it barred extrinsic evidence designed to impeach the testimony defense counsel elicited from R.H. Because defendant has not shown a clear or obvious error occurred, he has not shown plain error.

¶ 184    Defendant also contends that defense counsel was ineffective for failing to obtain a ruling on the admission of evidence that A.H. did not disclose abuse prior to eliciting R.H.'s testimony that defendant abused A.H. As noted, "[i]n order to succeed on a claim of ineffective assistance of counsel, a defendant must show (1) counsel's representation fell below an objective standard of reasonableness (deficiency prong) and (2) there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different (prejudice prong)." *Boyd*, 2018 IL App (5th) 140556, ¶ 16 (citing *Strickland*, 466 U.S. at 687-88). To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

¶ 185    Here, defendant is unable to show prejudice. See *Boyd*, 2018 IL App (5th) 140556, ¶ 19 (a reviewing court need not address both prongs of *Strickland* if the defendant makes an insufficient showing on one prong). On cross-examination, defense counsel asked R.H. questions that focused on what R.H. told Woodham about A.H., not what she saw defendant do. On redirect, the State elicited testimony from R.H. that she saw defendant touch A.H. in a similar way when A.H. sat on defendant's lap. The State did not specifically elicit testimony from R.H. that defendant touched

A.H.'s vaginal area. Defense counsel attempted to mitigate any prejudice resulting from the trial court's ruling by asking the court to bar reference to R.H.'s testimony about A.H. in closing arguments. The court granted counsel's request, and the parties obeyed the ruling, which minimized any prejudice defendant potentially suffered from the testimony. R.H.'s CAC interview was redacted to remove R.H.'s statements regarding A.H. and no other witness testified regarding alleged abuse towards A.H. In our view, defendant is unable to show that there was a reasonable probability the outcome of the trial would have been different without R.H.'s testimony regarding any abuse she allegedly witnessed defendant commit against A.H. Thus, he has failed to establish a claim of ineffective assistance of counsel.

¶ 186                                    E. Sentence

¶ 187   Lastly, defendant argues that his 20-year sentence for child pornography was excessive, and that the trial court abused its discretion by imposing consecutive sentences for aggravated criminal sexual abuse. The State argues that defendant failed to show that the court abused its discretion by imposing a 20-year sentence for child pornography and consecutive sentences for aggravated criminal sexual abuse. We agree with the State.

¶ 188   As an initial matter, we agree with the State that defendant forfeited review of these issues by failing to raise the issues in a posttrial motion. "It is well settled that, to preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required." *People v. Hillier*, 237 Ill. 2d 539, 544-45 (2010). Thus, "we may review this claim of error only if defendant has established plain error." *Id.* at 545. To obtain relief under the plain-error doctrine, a defendant must first show that a clear or obvious error occurred. *Piatkowski*, 225 Ill. 2d at 565. "In the sentencing context, a defendant must then show either that (1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious

68

as to deny the defendant a fair sentencing hearing." *Hillier*, 237 Ill. 2d at 545 (citing *People v. Hall*, 195 Ill. 2d 1, 18 (2000)). Defendant bears the burden of persuasion under either prong of the plain-error doctrine, and this court will honor the procedural default if he fails to meet his burden. *Id.*

¶ 189   Here, defendant claims first-prong plain error, arguing that a clear or obvious error occurred and that the evidence at sentencing was closely balanced. Alternatively, he argues that counsel was ineffective for failing to preserve review of these issues. The State argues that defendant has failed to prove either theory. We agree with the State.

¶ 190   1. Child Pornography Sentence

¶ 191   Defendant argues that the trial court's 20-year sentence for child pornography was excessive, where the sentence "was more punitive than necessary to account for [his] conduct and ignored the evidence that [he] would not likely reoffend after his release from prison." Specifically, defendant argues that the court "failed to assign *any* weight to the mitigating factor of the low probability that [he] would reoffend despite ample evidence to support it." (Emphasis in original.)

¶ 192   The trial court has broad discretionary powers in imposing a sentence, and the court's sentencing decision is entitled to great deference. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). The trial court is granted such deference because the trial court is generally in a better position than the reviewing court to determine the appropriate sentence. *Id.* The trial court "has the opportunity to weigh such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age." *Id.* (citing *People v. Streit*, 142 Ill. 2d 13, 19 (1991); *People v. Perruquet*, 68 Ill. 2d 149, 154 (1977)). Accordingly, this court "must not substitute its judgment for that of the trial court merely because it would have weighed these factors differently." *Id.* (citing *Streit*, 142 Ill. 2d at 19).

69

¶ 193   As charged in the present case, child pornography was a Class X felony with a sentencing range between 6 and 30 years in prison. 720 ILCS 5/11-20.1(a)(4), (c-5) (West 2018); 730 ILCS 5/5-4.5-25(a) (West 2018). Where, as here, an imposed "sentence falls within the statutory limits, it will not be overturned on appeal absent an abuse of discretion." *People v. Bunning*, 2018 IL App (5th) 150114, ¶ 16. "An abuse of discretion occurs only if a sentence greatly varies from the spirit and purpose of the law or where it is manifestly disproportionate to the nature of the offense." *Id.*

¶ 194   In applying these principles to the present case, defendant fails to show that the trial court abused its discretion by sentencing him to 20 years in prison—a sentence well within the sentencing range of 6 to 30 years. The record reveals that the court reviewed all evidence presented, all factors in aggravation and mitigation, the PSI report, the seriousness of defendant's offense, and all arguments by the parties before imposing defendant's sentence.

¶ 195   Defendant argues that the trial court failed to consider the evaluation indicating that he had a 2.8% chance of reoffending within five years, where the court found the statutory mitigating factor that the conduct was the result of circumstances unlikely to recur (730 ILCS 5/5-5-3.1(a)(8) (West 2022)) did not exist. Contrary to defendant's argument, we note that the court specifically stated that it considered the evaluation. The court also stated that it considered the PSI, which summarized the evaluation. This court presumes that the trial court considered the evaluation when sentencing defendant, where there is no indication in the record other than the sentence itself. See *People v. Brown*, 2017 IL App (1st) 142877, ¶ 64. The trial court had discretion to weigh the evidence and was not required to assign any value to it. See *id.* ¶ 63. We conclude that the trial court considered the evaluation but found that the evaluation did not establish this mitigating factor. See *id.*

¶ 196   As the State correctly notes, a 2.8% risk of recidivism over five years, although a low risk, is not a zero percent risk. In addition, the evaluation demonstrated that defendant scored in the high range on the risk factors of irresponsibility, manipulativeness, and impulsivity. The evaluation further indicated that defendant was diagnosed as a pedophile. Moreover, the PSI included statements made by Megan Howder regarding defendant's alleged sexual abuse of her as a child. Although the trial court stated that it did not consider those statements as part of defendant's criminal history, defense counsel acknowledged that Megan Howder's statements were before the court. Consequently, there was evidence before the court that could be viewed to indicate that defendant's conduct was likely to recur.

¶ 197   Moreover, although defendant argues that he no longer would have unfettered access to R.H., we note that the testimony defendant presented at the sentencing hearing could be viewed as demonstrating that defendant would have access to other children. Notably, various family members testified that defendant regularly interacted with their children without issue. Accordingly, there was additional evidence that could be viewed to demonstrate that defendant could continue to have access to other children.

¶ 198   In sum, the trial court imposed a sentence well within the statutory limits after considering the statutory aggravating and mitigating factors. We cannot say that the sentence imposed by the court "greatly varies from the spirit and purpose of the law" or that "it is manifestly disproportionate to the nature of the offense." *Bunning*, 2018 IL App (5th) 150114, ¶ 16. Thus, we conclude that the court did not abuse its discretion by sentencing defendant to 20 years for the offense of child pornography. Because the court did not err, we conclude that there was no plain error and counsel was not ineffective.

¶ 199   2. Consecutive Sentences for Aggravated Criminal Sexual Abuse

¶ 200   Defendant argues that the trial court erred by imposing consecutive sentences on counts II and III. In support, defendant asserts that the facts failed to support the court's determination that consecutive sentences were necessary to protect the public.

¶ 201   A trial court may impose a consecutive sentence if, *inter alia*, "having regard to the nature and circumstances of the offense and the history and character of the defendant, it is the opinion of the court that consecutive sentences are required to protect the public from further criminal conduct by the defendant, the basis for which the court shall set forth in the record." 730 ILCS 5/5-8-4(c)(1) (West 2022). "Because the trial court is in the best position to consider a defendant's credibility, demeanor, general moral character, mentality, social environment, and habits, the trial court's imposition of consecutive sentences will not be reversed on appeal absent an abuse of discretion." *People v. Buckner*, 2013 IL App (2d) 130083, ¶ 36. "The record must show that the trial court concluded that consecutive terms were necessary to protect the public." *Id.* "If the record does not reflect that the trial court took mitigating factors into account, including a defendant's potential for rehabilitation, and the record does not support the trial court's determination that consecutive sentences were necessary to protect the public, an abuse of discretion has occurred." *Id.*

¶ 202   We find *People v. Carter*, 272 Ill. App. 3d 809 (1995), and *People v. Sanders*, 356 Ill. App. 3d 998 (2005), instructive. In *Carter*, defendant was convicted of aggravated criminal sexual assault and aggravated criminal sexual abuse relating to acts he committed against his minor daughter and minor son, and he was sentenced to 15 years for the assault and 6 years for the abuse,

72

to run consecutively.[5] In upholding defendant's sentences on appeal, the Fourth District noted that the defendant had a significant criminal history, including felonies, and that

> "it [was] reasonable for the [trial] court to view as more serious these offenses committed by [the] defendant over a period of time during which, as the trial court noted, he had an opportunity to reflect on his actions and the adverse impact they were having on the victims. The fact that the victims were [the] defendant's young children [wa]s also a proper focus of the trial court's attention, given the authority [the] defendant exercised over them and the violation of trust that occurred." *Carter*, 272 Ill. App. 3d at 812.

The Fourth District further noted that the defendant lacked remorse and did not take responsibility for his actions. *Id.* at 813. The Fourth District concluded by stating, "The trial court was within the bounds of its discretion to consider, as it did, that the public needed protection from [the] defendant in light of the fact that, in committing the offenses, he preyed upon the most vulnerable in society." *Id.*

¶ 203   In *Sanders*, the defendant was found guilty of three counts of aggravated criminal sexual assault against minor victims and sentenced to three consecutive 15-year sentences. 356 Ill. App. 3d at 1002-03. In upholding defendant's consecutive sentences on appeal, the First District found the reasoning of *Carter* instructive. *Id.* at 1008. The First District noted that, although defendant had no prior convictions, he had prior arrests for theft and battery. *Id.* at 1009. The First District noted that, after his arrest for the aggravated criminal sexual assault charges, he was arrested for unlawful use of a weapon, battery, and criminal trespass, all of which were " 'SOLed.' " *Id.* The First District noted that this demonstrated the defendant's association with criminal activities in

---

[5]The defendant's sentences were later vacated on appeal due to the trial court's erroneous belief that consecutive sentences were mandatory; however, the trial court imposed the same sentences upon resentencing. *Carter*, 272 Ill. App. 3d at 810.

addition to the charged crime at issue. *Id.* The First District noted, however, that defendant testified that "he was taught right from wrong and, thus, knew that what he did to [the victims] was wrong." *Id.* The First District noted that the defendant continued to deny any involvement, placed blame on his wife, and never showed remorse for his actions. *Id.* The First District further noted that, similar to *Carter*, the defendant "engaged in conduct over a period of time during which he had the opportunity to reflect upon his actions and the adverse impact his conduct would have on [the minor victims]." *Id.* at 1009-10. The First District further noted that the defendant "was a father figure to [the victims] and exerted his authority over them in violation of their trust." *Id.* at 1010. Accordingly, the First District agreed with the trial court's statement that "[the] defendant's conduct was 'so heinous and unbelievably degrading and harmful to the public and citizens of our community.' " *Id.* Thus, the First District affirmed the trial court's imposition of consecutive sentences, finding that "the trial court was within the bounds of discretion, despite defendant's lack of criminal history, to conclude that consecutive sentences were necessary to protect the public." *Id.*

¶ 204   Similarly, here, defendant lacked a significant criminal history; however, the trial court did not abuse its discretion by concluding that consecutive sentences were necessary to protect the public. The evidence demonstrated that defendant denied involvement and placed blame on his ex-wife. The evidence also demonstrated that defendant engaged in conduct over the course of several years during which he had the opportunity to evaluate his actions and the adverse impact his conduct would have on R.H. Moreover, defendant was R.H.'s grandfather, and he held a position of authority over her when he babysat. Under these circumstances, we conclude that the trial court was well within its discretion to conclude that consecutive sentences were necessary to protect the public.

¶ 205   Thus, the trial court did not err by imposing consecutive sentences for aggravated criminal sexual abuse. Because the court did not err, we conclude that there was no plain error and counsel was not ineffective.

¶ 206                                     III. Conclusion

¶ 207   For the foregoing reasons, we affirm the trial court's judgment and sentence.


¶ 208   Affirmed.